73 Cal.Rptr.3d 277 (2008)
160 Cal.App.4th 1107
Benetta BUELL-WILSON et al.,
v.
FORD MOTOR COMPANY et al., Defendants and Appellants.
Nos. D045154, D045579.
Court of Appeal of California, Fourth District, Division One.
March 10, 2008.
*288 Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., William E. Thomson, Los *289 Angeles, Eileen M. Ahern and Theodore B. Olson, for Defendants and Appellants.
Arnold & Porter, Ronald C. Redcay, Los Angeles, Murray R. Garnick, Robert A. McCarter; National Chamber Litigation Center, Robin S. Conrad and Amar D. Sarwal, for the Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendants and Appellants.
Mayer Brown and Donald M. Falk, Palo Alto, for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendants and Appellants.
Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Keith D. Kessler, San Francisco; Schoville & Arnell, Dennis A. Schoville, Louis G. Arnell, San Diego, and James S. Iagmin, for Plaintiffs and Respondents.
NARES, J.
This case is before us for a second time, after a GVR[1] order from the United States Supreme Court directed that we reconsider our original opinion in Buell-Wilson v. Ford Motor Company (2006) 141 Cal.App.4th 525, 46 Cal.Rptr.3d 147 (Buell-Wilson I) in light of Philip Morris USA v. Williams (2007)-549 U.S. ___, 127 S.Ct. 1057, 166 L.Ed.2d 940 (Philip Morris). Philip Morris holds that upon request, courts must adopt procedures to ensure juries do not punish defendants for harm caused to third parties when determining the amount of punitive damages to award. The Supreme Court also reiterated, however, juries could consider harm to third parties in determining the reprehensibility of a defendant's conduct.
Ford asserts that based on Philip Morris it is entitled to a new trial (or at least a further reduction in the punitive damages award) because there is a "significant risk" the punitive damages verdict in this case was based on improper evidence and arguments concerning third party harm. Ford also asserts that we should reconsider our original decision's rejection of its arguments that (1) California's punitive damages statute (Civil Code section 3294) is unconstitutionally vague as applied to this case, and (2) the trial court erred in excluding its industry custom and practice evidence. We granted permission to the Chamber of Commerce of the United States of America (the Chamber) and the Product Liability Advisory Council, Inc. (PLAC) to file amicus curiae briefs to support Ford's contentions on remand.
We have reconsidered our decision in Buell-Wilson I in light of Philip Morris. Based on our analysis of Philip Morris and our review of our original decision and the proceedings in the trial court, we conclude Philip Morris does not compel a reversal or a further reduction of the punitive damages awarded in this case. Ford has forfeited the right to assert there is a significant risk the punitive damages verdict in this case was based on improper evidence and arguments concerning third party harm because Ford (1) submitted incorrect and misleading jury instructions on third party harm; (2) did not timely object to plaintiffs' closing argument at the punitive damages phase of the trial; (3) did not request a limiting instruction during the liability phase of the trial; and (4) did not raise instructional error as an issue on its original appeal. We also conclude our original decision reduced the punitive *290 damages award to a constitutionally permissible amount that does not punish Ford for harm to third parties. We hold there was no evidence or argument at trial that created a significant risk that the jury, in deciding the amount of punitive damages to award, punished Ford for harm it caused to third parties. Finally, we conclude Philip Morris does not require that we change any of the holdings in our original opinion, and thus, with some changes, "we reiterate [our original opinion] in its entirety." (People v. Velasquez (1980) 28 Cal.3d 461, 462, 171 Cal.Rptr. 507, 622 P.2d 952.)

INTRODUCTION
Benetta Buell-Wilson (Mrs. Wilson) brought this action against Ford Motor Company (Ford) and Drew Ford (Drew)[2] as a result of the rollover and roof crush of her Ford Explorer (Explorer) that left her a paraplegic. Mrs. Wilson's husband Barry Wilson (Mr. Wilson) brought a claim for loss of consortium against Ford and Drew. A jury found in favor of Mrs. Wilson and Mr. Wilson (together the Wilsons), finding that (1) the Explorer was defectively unstable; (2) the Explorer was not crashworthy due to a defect in the roof; (3) Drew failed to warn the Wilsons that the Explorer was defectively unstable; and (4) Ford and Drew failed to warn the Wilsons of the danger posed by the defect in the roof. The jury awarded Mrs. Wilson $109,606,004 in damages for her injuries, consisting of $4,606,004 in economic damages and $105 million in noneconomic damages, and awarded Mr. Wilson $13 million for his loss of consortium. The jury also found that Ford acted with "oppression, fraud or malice" and awarded the Wilsons $246 million in punitive damages. The court later reduced Mrs. Wilson's total compensatory damages award to $70 million, resulting in an award of $4,606,004 in economic damages and $65,393,996 in noneconomic damages. The court reduced Mr. Wilson's loss of consortium damages to $5 million. The court reduced the punitive damages award to $75 million, a one-to-one ratio to the Wilsons' total reduced award of compensatory damages.
On appeal Ford asserts (1) it is entitled to a new trial because the court erroneously admitted evidence about stability problems with a predecessor vehicle, the Ford Bronco II (Bronco II), and erroneously excluded evidence of the Explorer's "real-world" safety record and comparative data; (2) the noneconomic portion of the compensatory damages award was excessive and an unconstitutional violation of Ford's due process rights; (3) punitive damages were improperly awarded because (a) at most the Wilsons proved that "reasonable people could disagree regarding" the design decisions Ford made, and (b) California's punitive damages law is unconstitutionally vague as applied; and (4) the punitive damages award was excessive and the product of improper considerations. We granted permission to the Chamber, the Alliance of Automobile Manufacturers (AAM) and the PLAC to file amicus curiae briefs to support Ford's contentions on appeal.[3]
We hold that (1) the award of noneconomic damages to Mrs. Wilson, as reduced by the trial court, is excessive under California law, is the product of "passion or prejudice," and must be reduced to $18 *291 million; (2) the reduced award for loss of consortium in the amount of $5 million is reasonable and is affirmed; and (3) the award of punitive damages is excessive, violates federal due process limitations, and must be reduced to $55 million, a ratio of approximately two to one to the total compensatory damage award, after our reduction, of $27,606,004 ($4,606,004 in economic damages + $18 million in noneconomic damages + $5 million for loss of consortium). We issue a remittitur conditioning affirmance of the judgment on the Wilsons' agreement to those reductions. Thus, if the Wilsons accept the remittitur, the total judgment will be reduced to $82,606,004 ($4,606,004 in economic damages + $18 million in noneconomic damages + $5 million in loss of consortium + $55 million in punitive damages). We reject the remainder of the arguments made by Ford and amici curiae.[4]

FACTUAL AND PROCEDURAL BACKGROUND

A. The Accident

At around 5:00 p.m. on January 19, 2002, Mrs. Wilson, a married 46-year-old graduate student and mother of two, was driving her 1997 four-door Explorer within the speed limit on Interstate 8 near Alpine, California. The road was dry and sloped slightly downhill.
Suddenly, Mrs. Wilson saw what appeared to be a metal object break loose from a motor home in front of her and bounce directly toward her windshield. As she swerved to avoid the object, the wheels on the passenger side lifted from the road, and the Explorer went out of control. The vehicle fishtailed multiple times across lanes and rolled four and a half times, coming to rest on its roof on the road's shoulder. Ford conceded at trial that Mrs. Wilson bore no fault for the accident.
As the Explorer rolled, its roofs pillars and rails crumpled, and the roof crushed down more than 10 inches, causing severe injuries to Mrs. Wilson. Inside the vehicle, she hung upside down from her seatbelt, in "crushing ... unbelievable pain," gasping for breath and feeling as if her life were fading away. Motorists stopped to assist and struggled to flip the vehicle, and rescue crews cut the roof open to remove her. An ambulance took her from the scene to a life flight helicopter, which flew her to Sharp Memorial Hospital (Sharp) trauma center.

B. Mrs. Wilson's Injuries

1. Physical injuries

The compressive forces from the collapsing roof fractured and severed Mrs. Wilson's spine at the T12 level, where the thoracic and lumbar regions meet. She will never recover sensation or function below the level of that injury. She also suffered facial injuries, fractured ribs, a cut spleen that caused internal bleeding, a fractured leg and torn PCL and ACL ligaments *292 in both knees, causing bilateral knee dislocations.
In addition to the vertebral fractures, the spinal sac was damaged, causing leaking of cerebral spinal fluid, and portions of the spinal cord and nerve root were pulverized. Doctors inserted metal screws and rods into her back to stabilize her upper body. After almost two weeks, she was transferred to Sharp's rehabilitation center, where she spent another two and a half months.
Mrs. Wilson's resulting paraplegia ended her active life and forced her to painfully relearn basic aspects of daily living, some of which she will never regain. She lives in severe and constant pain that will increase over time. Her accident left her with no sensation from the waist down, except "phantom pain"a constant burning sensation below her ribs. Above her waist, she suffers constant pain, feels painful pressure on her ribs from the rods in her back, and has intermittent spasms of stabbing pain.
Medication can provide temporary pain relief, but the strong medication needed has serious side effects. It causes her to lose alertness, which makes it impossible to drive. It interferes with her ability to communicate socially. It makes her unsteady in her wheelchair. She also runs the risk of becoming addicted to the medication. There is a constant conflict between efforts to reduce her pain and the debilitating side effects of the medicine itself.
The spinal injury caused a total loss of bladder and bowel control. She must now catheterize herself multiple times daily. Her feces must be manually extracted. In addition to the emotional pain and humiliation from losing control over her bodily functions, she suffers recurring urinary tract infections, which expose her to a potentially fatal kidney disease. Mrs. Wilson is allergic to commonly prescribed medications, including sulfa and penicillin, and her chronic use of antibiotics to fight infections has caused resistance to other drugs.
Mrs. Wilson also suffers severe bruising, which takes months to heal due to diminished circulation in her lower body. Her feet swell and are susceptible to cracking and bleeding. The constant grinding of her shoulder joints from wheeling her wheelchair has caused shoulder problems, which will worsen over time. She suffers disfigurement, with one leg smaller than the other and large surgical scars across her back.

2. Mental and emotional injuries

Before the accident, Mrs. Wilson was an active, athletic, outdoors woman, with a black belt in martial arts. She often camped and hiked with her family, backpacked with Girl and Boy Scouts, helped with the San Diego Tracking Team, and did projects at Mission Trails Regional Park. She and her husband took dancing lessons, traveled and took walks.
She no longer can engage in any of the active lifestyle she once enjoyed, including swimming, skiing, snowboarding, dancing, backpacking and walking. Mrs. Wilson was finishing her masters degree in education and was about to start a second career as a teacher. These plans also have been indefinitely delayed and it is unclear whether they are now possible.
Mrs. Wilson is unable to visit all the rooms in her homeincluding her own bedroombecause they are inaccessible to her. She and Mr. Wilson must sleep in their laundry room.
She has changed from a giving, enthusiastic, independent person who took joy in aiding others, to being dependent on others for almost every aspect of her life. *293 Her husband and children are now her caregivers.

C. Mr. Wilson's Loss of Consortium

The injuries to his wife dramatically changed Mr. Wilson's life as well. The Wilsons no longer share the physical relationship they had prior to the accident. Instead, he is now her caregiver and must assist her with the most personal of care, including showering and catheterizing her. He assists her in transferring in and out of her wheelchair and worries that she may fall if she tries to transfer on her own. Several times per night, he wakes to turn his wife over in bed so that she will not get bedsores.
Mr. Wilson has had to decrease his work schedule as an attorney to assist his wife during the day and accompany her to medical appointments and therapy. He performs the household work that his wife can no longer do. The Wilsons spend most of their time trying to accomplish the mundane chores of daily life. Every day Mr. Wilson shares his wife's constant pain, frustration and anxiety in living with her injuries.

D. The Explorer's Defects

The Wilsons submitted evidence at trial that the accident and resulting injuries were caused by two independent defects in the 1997 Explorer. They established that the Explorer's design was dangerously unstable and prone to rollover due to its overly narrow track width and high center of gravity. They also established that the Explorer's roof was inadequately supported and defectively weak, so that it readily crushed into the passenger compartment when subjected to the forces inherent in a foreseeable rollover.
Ford has not challenged on appeal the sufficiency of the evidence supporting the jury's finding that the Explorer was defective on either of these grounds.[5] We therefore review the evidence in the light most favorable to the judgment, disregarding contrary evidence submitted by Ford. (Bickel v. City of Piedmont (1997) 16 Cal.4th 1040, 1053, 68 Cal.Rptr.2d 758, 946 P.2d 427.)

1. Stability defects

Long before the Wilsons purchased their Explorer, Ford's engineers knew that the vehicle's design was unstable and prone to rollover in emergency maneuvers due to its high center of gravity and narrow track width. Ford had known for decades the importance of vehicle stability in emergency maneuvers. It knew that on flat, dry pavement, a car or truck should slide out, rather than roll.
The Explorer was derived from the Bronco II and evidence of its development history was presented to the jury to show it how and why the Explorer's instability defect came to exist. In 1981, two years before the Bronco II's introduction, Ford measured the stability index (SI) of its competitor, the Jeep CJ7, which had a widely reported rollover problem. The SI is the average of front and rear track width, divided by the center of gravity height. The higher the SI rating (i.e., the wider the track and lower the center of gravity), the more stable the vehicle. The Jeep's SI was 2.04. The Bronco II's SI was less, measuring 1.86. The Bronco II was so unstable it would roll over at only 30 mph on Ford's test track. Ford engineers proposed improving its stability index by widening its track width. Because *294 doing so would have delayed the vehicle's release date and impacted profits, that proposal was rejected by management.
Ford knew that people were being seriously injured in Bronco II rollovers when the Explorer was being developed. In April 1989, a year before the Explorer release date, Ford executives objected to and tried to stop the release of a damaging Consumer Reports article on Bronco II instability.
Regarding these efforts, Jerry L. Sloan of Ford's public affairs office wrote:
"We think going in we were in deep trouble regarding our rollover rates.... [¶] ... Our rollover rate is three times higher than the Chevy S-10 Blazer.... [T]he [Fatality Analysis Reporting System (FARS)] data put us in a bad light.... [¶] ... [¶] We think, however, that we have clouded their minds...."
Instead of making design improvements in stability for the Explorer, Ford utilized the Bronco II platform. The Explorer had almost exactly the same track width, high engine mount and elevated center of gravity as the Bronco II, which caused the same instability problems. Over half the parts for the four-door and 80 percent for the two-door Explorer were carried over from the Bronco II.
Ford's design engineers repeatedly requested Ford to widen the track width and lower the center of gravity on the Explorer to increase its stability. However, management declined to do so. As acknowledged by Robert Simpson, a program manager for the development of the Explorer, this was because of "the ... investment that Ford had sunk into the Explorer," and, as the Wilsons' expert, Dr. David Renfroe, explained, it was also because its "directive was to meet Job 1 [the release date]." Dr. Renfroe also explained that "the engineers were proposing to make [stability index] changes to be consistent with their standards and they were prevented from doing that by the management."
Unable to pass the Consumers Union on-track stability test because the Explorer was rolling over at under 45 miles per hour, Ford resorted to using computer simulations to show the vehicle's safety. Ford claimed the validation data for its computer results did not exist, precluding an expert from determining whether the Explorer actually passed the computer tests. The Explorer did pass the Consumers Union short-course test, but that test was designed to measure its handling, not stability.
The Explorer's instability was increased by Ford management's decision to utilize P235 tires that further raised the center of gravity, instead of the P215 tires specified and requested by its engineers to provide greater stability. Based on his review of Ford internal documents, the Wilsons' expert, Dr. Renfroe, testified that Ford "knew when they made that decision that the vehicle was going to be more unstable and more likely to rollover in an accident avoidance maneuver, and they were ... willing to accept the risk and take it to court, if necessary." Ford chose larger tires to fill a cosmetic gap between the wheel well and tire in order to present a more "robust" look. Ford's own analysis showed that Explorers equipped with P235 tires would have an SI of 2.08, less than the then-current 1987 Bronco II's SI of 2.15. With the P235 tires, the Explorer failed basic J-turn stability tests.
In 1988 a Firestone engineer, who was working with Ford to analyze the stability effect of different tire sizes on the prototype Explorer, wrote to Ford complaining about the vehicle's inherent instability: "Most importantly, the vehicle still has [two-]wheel lift no matter what tire is on *295 it, 225/70, 215/75 or 205/75. So you're kidding yourself if anyone thinks going back to a base tire of 215/75 is going to solve anything."
Unable to pass stability tests with P235 tires, Ford executives in 1989 considered releasing the four-door Explorer on P225 tires in order to pass the Consumers Union test. Later, if the Explorer passed the test, Ford could release the vehicles with P235 tires, consistent with its marketing plan. In an internal Ford e-mail, this was referred to as a "strawman" that would "assure good performance in the [Consumers Union] Test and minimize any adverse Public Relations risk." Ford's decision to accept the risk of using the P235 tires is shown in an internal e-mail from Ford employee Roger Stornant to Charles White, a senior design engineer for the Explorer:
"OGC [the office of general counsel] is concerned we will be the only OEM [original equipment manufacturer] with a vehicle that has a significant chance of failing the CU [Consumers Union] test. I believe that management is aware of the potential risk w/P235 tires and has accepted risk."
Instead of using smaller tires, Ford executives decided in February 1989 to underinflate the P235 and P245 tires to 26 pounds per square inch (psi), as opposed to the tire's specification of 35 psi. Explorer owners were not informed of the need to underinflate the tires, nor were they told they were exposed to the risk of a rollover by complying with the tire's higher inflation specifications.
Ford had an opportunity to improve the Explorer's stability when it changed its suspension design for the 1995-1998 models. But again financial considerations prevailed and, according to a 1990 internal Ford document, Ford decided "not [to] take advantage of the fact that the engine could be lowered with a[n] SLA[6] type suspension. This decision was driven by early implementation and program cost." As a result, the Wilsons' 1997 Explorer was no more stable than the original model or its prototypes. According to the Wilsons' experts, the Explorer's inherent instability caused it to roll in response to Mrs. Wilson's emergency avoidance maneuver, resulting in her injuries.

2. Roof strength defect

As Mrs. Wilson's Explorer rolled, the roof crushed nearly a foot into the passenger compartment. The Wilsons' biomechanical expert, Dr. Anthony Sances, testified that Mrs. Wilson's spinal injury was caused by 1,000 to 2,000 pounds of force crushing down onto her shoulder. Dr. Frank Coufal, her neurosurgeon, confirmed that compressive force caused the spinal injury. The Wilsons' experts testified that a stronger roof would not have crushed and would have prevented Mrs. Wilson's injuries.
The Wilsons presented evidence that rollovers are relatively nonviolent events for the occupants when they are properly restrained and there is minimal roof intrusion, and occupants are killed or disabled only when the roof crushes inward.
The Wilsons also presented testimony from their engineering expert Stephen Forrest as to why the Explorer's roof was defectively weak. The evidence showed that Ford could have provided the Explorer with a roof that would not have crushed by using high strength steel, adding reinforcements, eliminating open sections such *296 as the depressed weld groove, eliminating holes and/or using foam filling. Ford had used safer closed section front headers in other vehicles. These modifications would have cost about $20 per vehicle.

3. Ford and Drew's failure to warn the Wilsons of the defects

The Wilsons testified that Ford and Drew did not provide notice of the Explorer's roof crush risk. The Wilsons also submitted evidence that Drew failed to warn them of the instability danger posed by inflating the P235 tires to the tire manufacturer's recommended psi. Drew did not disclose that their Explorer was equipped with larger P235 tires instead of smaller P225 or P215 tires, nor that underinflation was required for the larger tires. The salesmen at Drew were unaware of an underinflation requirement. Although Ford directed its dealers to use no more than 26 psi in P235 tires, Drew never warned the Wilsons of this fact. Because of this, the Wilsons never knew to instruct attendants to underinflate the tires below the specified 35 psi when the vehicle was serviced.
The Wilsons testified they never would have bought the Explorer if the rollover and tire pressure risks had been disclosed.

E. Trial and Jury Verdict

The jury deliberated for five days before reaching a verdict. It found nine to three the Explorer had a stability design defect that was a substantial factor in causing the Wilsons' injuries. The jury found 11 to one that there was a crashworthiness design defect in the roof and that this defect was also a substantial factor in their injuries.
As to Drew, the jury found 10 to two that Drew failed to warn the Wilsons of the stability defect. It found in favor of Ford on this count. The jury found 10 to two that both Ford and Drew failed to warn the Wilsons of the Explorer's crash-worthiness defect.
The jury awarded Mrs. Wilson $573,348 for past economic loss, $4,032,656 for future economic loss, $6 million for past noneconomic loss and $99 million for future noneconomic loss.
The jury found nine to three that Ford acted with oppression, fraud or malice. The court's poll of the jury confirmed each of the nine jurors had found fraud, malice or oppression by clear and convincing evidence.
In a separate phase of trial, the parties presented evidence and arguments on punitive damages. During closing argument, counsel for Ford said:
"It's impossible not to be angry at Ford, Ford Motor Company, for what decisions that in marketing and selling this Ford Explorer it knowingly put a defective product out on the market [sic] and caused the family tragedy that you see before you now.... [¶] ... [¶] ... We are sorry. I don't thinkI know it rings hollow, but I am going to say it anyway. We are sorry. We are sorry that we let you down. The engineers are sorry that they let the rest of the company down."
The jury awarded $246 million in punitive damages.

F. Posttrial Motions and Judgment

Ford filed motions for new trial and judgment notwithstanding the verdict (JNOV).
The JNOV motion attacked the evidence supporting the punitive damages award. The court reexamined the evidence and concluded that the Wilsons had met their burden of producing clear and convincing evidence that Ford acted with malice, a *297 conscious disregard for safety, and engaged in despicable conduct.
Ford's motion for new trial challenged the size of the compensatory and punitive damages award. The court found "the damages awarded are excessive," but also stated, "The Court does not find that the jury rendered its verdict due to passion or prejudice." The court conditionally granted a new trial unless the Wilsons consented to a reduction of Mrs. Wilson's compensatory damages award to $70 million, Mr. Wilson's loss of consortium award to $5 million and the punitive damages award to $75 million. Subtracting the jury's award of economic damages in the amount of $4,606,004, the court's remittitur left Mrs. Wilson with an award of noneconomic damages in the amount of $65,393,996.
In assessing the propriety of the amount of compensatory damages awarded to Mrs. Wilson, the court stated:
"The evidence, in the Court's opinion, is insufficient to support a compensatory damage verdict in favor of [Mrs. Wilson] in the amount of $109,606,004. In reaching that finding and the other findings on the verdict on damages, the Court has weighed the evidence, including reasonable inferences therefrom, and is convinced from the entire record the jury clearly should have reached a different verdict on damages. That same evidence, however, ... is sufficient to support a compensatory damage award in favor of [Mrs. Wilson] in the amount of [$70 million]."
In assessing the proper amount of punitive damages to be awarded the court stated:
"In considering these factors, the evidence showed Ford had a pattern of deficient design regarding safety in favor of increased financial returns and was a result of the conscious disregard of Ford executives. That evidence was primarily adduced through Ford's own internal memoranda and correspondence. This conduct was reprehensible and weighs in favor of punitive damages. [11] The remittitur reduces the punitive damage award to a one-to-one ratio relative to the compensatory award. This is well within the second guidepost set forth by the Supreme Court. Even as reduced, the compensatory damage award is large. When compensatory awards are substantial, a ratio of [punitive damages] equal to the compensatory damages is within the limits of the due process guarantee. [Citation.] The punitive damages are fair and reasonable and proportionate to the amount of harm suffered by the [Wilsons]."
The Wilsons accepted the remittitur and an amended judgment was entered on September 3, 2004. Ford's timely appeals followed.

ARGUMENT

I. EVIDENTIARY ISSUES

A. Bronco II Evidence

Ford asserts it is entitled to a new trial because the trial court erroneously admitted evidence regarding the Bronco II vehicle. This contention is unavailing.

1. Background

Ford contends the court erred in denying its motion in limine that sought to exclude as irrelevant "all evidence relating to the Bronco II and Ford's decision to cease manufacture of the Bronco II." In response, the Wilsons submitted evidence that the Explorer's relevant design characteristics were derived from the Bronco II and that Ford had knowledge of the rollover risk posed by that design.
The trial court denied Ford's motion, finding the Explorer's development was *298 "intimately tied" to the Bronco II's development, as shown by Ford's internal documents.
Ford's motion for new trial asserted the court erred by allowing evidence of the Bronco II. The court rejected this argument, finding that the Wilsons "presented substantial evidence of the design carryover from the Bronco II to the Explorer, evidence of the intermingling of the development and testing of the Bronco II and the Explorer and the similar source of rollover problems between the Bronco II and Explorer for the Court to find the two vehicles are substantially similar."

2. Analysis

"`Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.'" (City of Ripon v. Sweetin (2002) 100 Cal.App.4th 887, 900, 122 Cal.Rptr.2d 802.) "`"The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power."'" (Dorman v. DWLC Corp. (1995) 35 Cal.App.4th 1808, 1815, 42 Cal.Rptr.2d 459.)
The court did not abuse its discretion in admitting evidence of similar design flaws in the Bronco II to those alleged to exist in the Explorer. The Wilsons' expert, Dr. Renfroe, testified that the Explorer and the Bronco II shared the specific dangerous design characteristics that created instability. In fact, it would have been impossible not to have evidence on the similarities of the Explorer and Bronco II's stability characteristics as Ford itself assessed the stability of the Explorer by comparison to the Bronco II.
Ford asserts that it was error to introduce evidence of the Bronco II because they were different vehicles, citing many differences in design. However, the evidence went to similarities in a particular design flaw, not the vehicles as a whole. Where a plaintiff intends to adduce evidence of the functioning of related products to prove that the product in question was defective, identical conditions need not be present between the two systems. Substantial similarity is sufficient. (See Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388, 403-404, 185 Cal.Rptr. 654, 650 P.2d 1171 (Hasson), disapproved on other grounds in Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 574, 34 Cal.Rptr.2d 607, 882 P.2d 298 (Soule).) Thus, in an action against an automobile manufacturer to recover damages arising out of an automobile accident caused by brake failure in a 1966 model vehicle, the California Supreme Court held that the trial court had a reasonable basis for admitting evidence of numerous failures occurring in 1965 models for the purpose of showing that 1966 models were similarly defective, even if plaintiffs did not prove that the 1965 system was exactly the same as the 1966 system. (Hasson, supra, at pp. 403-404, 185 Cal.Rptr. 654, 650 P.2d 1171.)
Ford argues that the Explorer's and Bronco II's stability characteristics were not sufficiently similar to allow the evidence concerning the Bronco II. The trial judge in the first instance must determine if the design characteristics are sufficiently similar. (Hasson, supra, 32 Cal.3d at p. 404, 185 Cal.Rptr. 654, 650 P.2d 1171.) As discussed, ante, the court found that the Bronco II's and Explorer's relevant design characteristics were substantially similar, and we must give substantial deference to that finding. (See Bado-Santana v. Ford Motor Co. (D.P.R.2005) 364 F.Supp.2d 79, 92-94 [in rollover case involving *299 Explorer, court denied Ford's motion in limine to exclude evidence of design and development history of Bronco II as too dissimilar to Explorer, finding such evidence relevant to Ford's knowledge of and failure to correct stability design flaws].)
Moreover, "[w]hen evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is relaxed: `"[A]ll that is required ... is that the previous injury should be such as to attract the defendant's attention to the dangerous situation."'" (Hasson, supra, 32 Cal.3d at p. 404, 185 Cal.Rptr. 654, 650 P.2d 1171.) Here, the evidence was relevant to prove that Ford knew it was designing and manufacturing a vehicle with the same stability design defects as the Bronco II.
The Bronco II evidence was also relevant to show Ford's malice in order to support an award of punitive damages. "Marketing a product that is known to be defective and dangerous to consumers supports an inference of malice for purposes of punitive damages." (Karlsson v. Ford Motor Co. (2006) 140 Cal.App.4th 1202, 1230, 45 Cal.Rptr.3d 265 (Karlsson); Grimshaw v. Ford Motor Co. (1981) 119 Cal.App.3d 757, 814, 174 Cal.Rptr. 348 (Grimshaw); Taylor v. Superior Court (1979) 24 Cal.3d 890, 895, 157 Cal.Rptr. 693, 598 P.2d 854 (Taylor) [malice may be shown by fact the defendant had acted with a "conscious disregard of the safety of others"].)
Ford knew that to increase a vehicle's stability, it needed to widen the vehicle's track width and lower the center of gravity. The Wilsons presented evidence that Ford engineers requested such changes in the Explorer's design, but the changes were rejected. The Explorer's center of gravity, track width and SI were substantially similar to that of the Bronco II.
The court did not abuse its discretion in admitting evidence concerning the Bronco II's stability problems, as the Explorer's stability characteristics were substantially similar. The evidence was relevant to prove the cause of the Explorer's stability defect, to show notice on Ford's part at the time it was designing the Explorer and to establish malice on the part of Ford.

B. Exclusion of Ford's Comparative Rollover Statistics

Ford asserts that the court erred by excluding Ford's "real-world safety record and comparative data" relating to Explorer rollover rates. We reject this contention.

1. Background

Ford cites several evidentiary rulings it asserts were erroneous regarding the Explorer's comparative rollover rates. First, the court ordered stricken from the trial court record testimony offered by Ford that the Explorer "had one of the best rollover rates compared to other SUV's [sports utility vehicles] in its class." The court also refused to allow Ford's automotive engineering expert, Don Tandy, to testify as to whether the Explorer had a higher rollover rate than other SUV's. Ford asserts that the court erred in refusing to allow its statistical expert, William Wecker, Ph.D., to testify that the Explorer had a rollover rate comparable to other SUV's. The court also refused to allow Ford's stability expert, Lee Carr, to testify concerning accident statistics and rollover rates of other vehicles.
Ford also contends that the court "compounded its errors" by allowing several of the Wilsons' witnesses to testify concerning their involvement in other Explorer rollover cases.

*300 2. Waiver

The Wilsons assert that Ford waived the right to assert error regarding the testimony of its expert Dr. Wecker concerning the Explorer's rollover rate compared to other vehicles. The Wilsons point out that they brought a motion in limine to exclude his opinion, but the court reserved ruling on his testimony pending a foundational showing by Ford, and thereafter Ford did not attempt to lay a foundation for his testimony.
Ford responds that the court ruled Dr. Wecker's testimony inadmissible in an unreported sidebar conference and that counsel for the Wilsons acknowledged this ruling on the record when it argued against admission of other similar evidence that Ford could not "get in from the Wecker types." Ford also asserts that it objected on several occasions more generally that it should have been allowed to present evidence of the Explorer's safety record as compared to other vehicles.
We conclude that there was no waiver. First, a review of the trial transcript indicates that counsel for the Wilsons did acknowledge on the record that Dr. Wecker's testimony was previously excluded by the court. Moreover, "`[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal....' [Citation.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2005) ¶ 8:275.6, p. 8-154.)

3. Analysis

Ford asserts the expert testimony concerning the Explorer's comparative rollover rate was admissible to demonstrate that the Explorer "is a reasonably safe vehicle that is not unusually prone to roll over in comparison to other vehicles." However, such evidence was irrelevant and inadmissible.
A manufacturer cannot defend a product liability action with evidence it met its industry's customs or standards on safety. (Grimshaw, supra, 119 Cal.App.3d at p. 803, 174 Cal.Rptr. 348; Foglio v. Western Auto Supply (1976) 56 Cal.App.3d 470, 477, 128 Cal.Rptr. 545.) In fact, admission of such evidence is reversible error. (Heap v. General Motors Corp. (1977) 66 Cal.App.3d 824, 830-832,136 Cal. Rptr. 304; see also Use Note to BAJI No. 3.16 (Fall 2007-2008 ed.) p. 78 [entitled "Evidence of Custom in Relation to Ordinary Care"; "It is error to give this instruction in a cause of action limited to strict liability"].). This is because in strict liability actions, "the issue is not whether defendant exercised reasonable care." (Foglio, supra, 56 Cal.App.3d at p. 477, 128 Cal.Rptr. 545.) Rather, the issue is whether the product fails to perform as the ordinary consumer would expect. (Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 435, 143 Cal.Rptr. 225, 573 P.2d 443 (Barker).)
In Grimshaw, supra, 119 Cal.App.3d 757, 174 Cal.Rptr. 348, the defect at issue was the Ford Pinto's gas tank. There, Ford requested the court instruct the jury that, in considering whether the gas tank was defective, it was to consider "`the extent to which its (Pinto's) design and manufacture matched the average quality of other automobiles and the extent to which its design and manufacture deviated from the norm for automobiles designed and manufactured at the same point in time.'" (Id. at p. 803, 174 Cal.Rptr. 348.) The Court of Appeal held that the trial court properly refused the instruction as improper evidence of industry custom or practice. (Ibid.)
*301 Here, the trial court properly excluded evidence Ford proffered to prove the Explorer's rollover rate was comparable to other vehicles on the road. That evidence impermissibly sought to show that it met industry standards or custom for rollovers.
Ford asserts that the comparative rollover rate was relevant to the "risk/benefit" analysis that must be considered in determining if a product is defective, citing Barker, supra, 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443. However, as explained in Grimshaw, the Barker risk/benefit analysis does not allow admission of such evidence:
"The Barker court's enumeration of factors which may be considered under the risk-benefit test not only fails to mention custom or usage in the industry, the court otherwise makes clear by implication that they are inappropriate considerations." (Grimshaw, supra, 119 Cal. App.3d at p. 803, 174 Cal.Rptr. 348.)
Ford also contends that the comparative rollover evidence was relevant to prove it did not act with oppression, fraud or malice and therefore was admissible to rebut the Wilsons' claim for punitive damages. However, as will be discussed in more detail, post, the Court of Appeal in Grimshaw, supra, 119 Cal.App.3d 757, 174 Cal.Rptr. 348, held that compliance with industry standards or custom was irrelevant not only to the issue of defect, but also to the issue of punitive damages. (Id. at pp. 792, 803, 807-822, 174 Cal.Rptr. 348.) Indeed, counsel for Ford acknowledged at trial that the Wilsons' punitive damages allegations did not change Grimshaw's prohibition on industry custom and practice evidence.
Even if the comparative rollover data were not inadmissible as a matter of law as improper industry and custom evidence, it would still be inadmissible as unreliable and misleading. Ford's statistics from which the comparable rollover rate testimony would flow were drawn from two databases, FARS and a state database tracking state accident information. FARS only included fatal rollover accidents and did not compare the relative stability of vehicles, included all vehicle types, not just SUV's, and did not track the cause of rollovers or the resulting injuries. The state database encompassed accidents from only 10 states, did not include the two most populous states, California and Texas, and did not detail causes of the rollovers.
In Ford's offer of proof for its expert Carr, it acknowledged his proposed testimony compared the Explorer's rollover performance to a variety of dissimilar vehicles, including Greyhound buses and passenger cars. The court excluded only that portion of his testimony. Carr opined that the Explorer's design did not contribute to the rollover. Rather, according to Carr, the Explorer rolled because Mrs. Wilson steered it onto the dirt shoulder, which, because of the loose soil and uneven terrain, would make any vehicle, not just the Explorer, susceptible to rolling over. Carr also testified that the Explorer complied with stability guidelines related to steering. Over the Wilsons' objection, Carr was allowed to show a video of the rollover response of a 1992 Chevrolet van to challenge the testing methodology used by the Wilsons' expert, Dr. Renfroe. Over the Wilsons' objection, he was also allowed to testify concerning the number of rollovers of various vehicles around the country. According to Carr, the vast majority of rollovers for all types of vehicles happened off the paved surface of the road.
Further, while the court excluded evidence of the Explorer's comparative safety, accident or injury rates, it did not exclude the Explorer's own "real-world *302 safety record." Indeed, Ford never proffered such evidence at trial.
The court did not abuse its discretion by excluding Ford's proffered evidence on comparative rollover rates. The court also did not "compound its errors" by allowing several of the Wilsons' witnesses to testify as to their involvement in other Explorer rollover cases. Ford did not object to this testimony as improper. The only objection to this testimony overruled "by the court was Ford's "asked and answered" objection.

II. NONECONOMIC DAMAGES

Ford asserts that the noneconomic damages award of approximately $65 million to Mrs. Wilson, and the $5 million award to Mr. Wilson, as remitted by the court, are excessive as a matter of law, are the result of passion and prejudice, are extreme when viewed against awards that have been upheld in comparable cases, and violate its due process rights. Amicus curiae AAM also asserts that the award violates due process principles. We conclude that the noneconomic damage award to Mrs. Wilson is excessive, the result of passion or prejudice, and that the substantial evidence in this case supports an award of $18 million. We also conclude, however, that Mrs. Wilson's award did not violate due process principles. We conclude the award to Mr. Wilson of $5 million in damages for loss of consortium is reasonable and we affirm that award.

A. Size of the Award

1. Standard of review

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently ... see the injury and the impairment that has resulted therefrom.... The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (Seffert v. Los Angeles Transit Lines (1961) 56 Cal.2d 498, 506-507, 15 Cal.Rptr. 161, 364 P.2d 337, citation omitted (Seffert).)
"The reviewing court does not act de novo, however. As we have observed, the trial court's determination of whether damages were excessive `is entitled to great weight' because it is bound by the `more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule....' [Citation.] All presumptions favor the trial court's determination [citation], and we review the record in the light most favorable to the judgment [citation]." (Fortman v. Hemco, Inc. (1989) 211 Cal. App.3d 241, 259, 259 Cal.Rptr. 311 (Fortman ).)
Further, "`[w]here the trial court has required a remission as a condition to denying a new trial "a verdict is reviewed on appeal as if it had been returned in the first instance by the jury in the reduced amount."'" (West v. Johnson & Johnson Products, Inc. (1985) 174 Cal.App.3d 831, 877, 220 Cal.Rptr. 437 (West).)

2. Analysis

In reviewing a noneconomic damage award "[t]here are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever *303 possible. [Citation.] The amount to be awarded is `a matter on which there legitimately may be a wide difference of opinion' [citation]. In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him [or her] the benefit of every inference reasonably to be drawn from the record [citation]. [¶] While the appellate court should consider the amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely. These factors must be considered." (Seffert, supra, 56 Cal.2d at p. 508, 15 Cal.Rptr. 161, 364 P.2d 337.)
Further, "[t]he fact that an award may set a precedent by its size does not in and of itself render it suspect. The determination of the jury can only be assessed by examination of the particular circumstances involved." (Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal. App.3d 626, 654-655, 151 Cal.Rptr. 399.)
"An appellate court should not assume to substitute its appraisal, for that of a jury, of the amount of damages for physical pain and mental suffering sustained by a party in a case where trial by jury was had as a matter of right [citation], but in a case where it appears that a verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment [citations] the appellate court may reverse the judgment and remand the case for a new trial either on all the issues or on the issue of damages alone [citations], or it may, in the interests of justice and with the consent of the party against whom the modification is made, modify the judgment as to the amount of damages, and affirm it as modified [citations]." (Deevy v. Tassi (1942) 21 Cal.2d 109, 120-121, 130 P.2d 389 (Deevy); see also Hunton v. California Portland etc. Co. (1944) 64 Cal.App.2d 876, 882-885, 150 P.2d 221 [trial court, on a motion for new trial, found compensatory damages award excessive and reduced a jury verdict of $40,000 to $18,000; on appeal the appellate court, finding the award still excessive, reduced the damages to $10,000].)
Ford characterizes the jury's award to the Wilsons of $118 million in noneconomic damages ($105 million to Mrs. Wilson + $13 million to Mr. Wilson) and the court-reduced award of approximately $70 million (approximately $65 million to Mrs. Wilson + $5 million to Mr. Wilson) as "irrational, punitive, and the clear product of passion and prejudice" and asserts that the evidence "does not come close to supporting this unprecedented award."[7] Although Mrs. Wilson's injuries were catastrophic, analyzing all appropriate factors, reviewing the trial court record, and using our collective experience, we conclude we must reduce the noneconomic damage award as excessive and the product of passion and prejudice. We also conclude the loss of consortium award to Mr. Wilson is reasonable and affirm that award. Because Ford focuses its discussion *304 almost exclusively on the award to Mrs. Wilson, our analysis likewise focuses on whether that award was excessive.[8]

a. Nature of Mrs. Wilson's injuries

A review of the evidence shows the substantial nature of the Wilsons' noneconomic injuries. Mrs. Wilson, a once vibrant and energetic wife and mother is now a paraplegic, who is in constant and debilitating pain, has lost all control over her bladder and bowel movements, and now requires constant care from her husband. She is disfigured and subject to ailments associated with her injuries that could worsen her injuries and shorten her life span. Mr. Wilson has lost his role as a husband. He is now a constant caregiver.
Noneconomic damages do not consist of only emotional distress and pain and suffering. They also consist of such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy. (Judicial Council of Cal. Civ. Jury Instns. (2008), CACI No. 3905A.)
In this case, the noneconomic damages suffered by Mrs. Wilson were substantial, permanent, and support a significant award. However, the reduced award of approximately $65 million is, even given the severity of her injuries, disproportionate to those injuries so as to "raise a strong presumption that it is based on prejudice or passion." (Saari v. Jongordon Corp. (1992) 5 Cal.App.4th 797, 807, 7 Cal.Rptr.2d 82.)

b. Amount of award versus projected life span

We also consider the amount of the damage award in connection with Mrs. Wilson's projected life span of 35 years.[9] The damage award, as reduced by the court, still amounts to approximately $1,868,399 per year over her projected life span, an extremely high amount. Ford on the other hand argues an award of $1 million is reasonable, which would work out to $28,571 per year, and only $78 per day. While we believe that the award as reduced by the trial court is still excessive, we also do not believe that Ford's suggested award fairly and justly compensates Mrs. Wilson.

c. Comparison with other awards

In support of its position the noneconomic damage award is excessive as a matter of law, Ford attempts to compare that award to published California decisions that have upheld damage awards on similar facts. The Wilsons, on the other hand, argue that it is not appropriate to compare the award here to other cases, and that we must review it only by looking at the particular facts of this case. We conclude that while it is appropriate to look at awards in similar cases, ultimately we must determine the propriety of the award on a case-by-case basis.
*305 In Seffert, supra, 56 Cal.2d at page 508, 15 Cal.Rptr. 161, 364 P.2d 337, the California Supreme Court stated, "While the appellate court should consider the amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely." (Italics added.)
More recently, the California Supreme Court made the following statements in a footnote: "Defendants have compiled a lengthy list of judgments awarding damages which have been reversed on appeal as excessive. Those cases do not, in and of themselves, mandate a reversal here. The vast variety of and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. [Citations.] Thus, we adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as a result of passion and prejudice on the part of the jurors." (Bertero v. National General Corp. (1974) 13 Cal.3d 43, 65, 118 Cal.Rptr. 184, 529 P.2d 608, fn. 12 (Bertero), italics added.)
The Wilsons assert that Bertero stands for the proposition that courts of appeal should not compare the damages in other similar cases at all in reviewing a claim that an award is excessive. However, we do not read Bertero so broadly. Its criticism of comparing damage awards from other cases was limited to the statement that judgments awarding damages in other cases "do not, in and of themselves, mandate a reversal." (Bertero, supra, 13 Cal.3d at p. 65, fn. 12, 118 Cal.Rptr. 184, 529 P.2d 608, italics added.) In the quoted footnote the Bertero court cited the earlier Seffert court as support for its conclusion. (Bertero, supra, at p. 65, fn. 12, 118 Cal. Rptr. 184, 529 P.2d 608.) Therefore, we conclude a verdict is not excessive as a matter of law simply because it exceeds the amount awarded in other cases. Courts of appeal must make their decisions based on the evidence in the case being reviewed. However, evidence of other verdicts is still relevant as a point of reference, to provide context to the award by establishing a range of values for similar injuries.
Ford cites five reported California decisions where noneconomic damages for purportedly similar injuries ranged from $1 million to $8.4 million. (Mendoza v. Club Car, Inc. (2000) 81 Cal.App.4th 287, 96 Cal.Rptr.2d 605 [50-year-old plaintiff award of $1 million]; Niles v. City of San Rafael (1974) 42 Cal.App.3d 230, 116 Cal. Rptr. 733 (Niles) [child suffered paralysis from head traumaaward of $1,604,371]; Rosh v. Cave Imaging Systems, Inc. (1994) 26 Cal.App.4th 1225, 32 Cal.Rptr.2d 136 [plaintiff rendered paraplegic from gunshotaward of $2.99 million]; Fortman, supra, 211 Cal.App.3d 241, 259 Cal.Rptr. 311 [three-year-old girl rendered paraplegic from fall from car$6 million award]; Hess v. Ford Motor Co. (2002) 27 Cal.4th 516, 117 Cal.Rptr.2d 220, 41 P.3d 46 (Hess) [plaintiff rendered paraplegic after his truck rolled$8.4 million award].)
*306 However, the cited cases are of only small assistance. Of the five California cases cited by Ford, in only two were the damages claimed to be excessive, and in both cases the damages awards were upheld. (Niles, supra, 42 Cal.App.3d at p. 244, 116 Cal.Rptr. 733; Fortman, supra, 211 Cal.App.3d at p. 261, 259 Cal.Rptr. 311.) In the case with the largest noneconomic damage award, the size of the award was not challenged on appeal. (Hess, supra, 27 Cal.4th at p. 520, 117 Cal.Rptr.2d 220, 41 P.3d 46.) Ford cites no published California decisions involving same or similar injuries where a noneconomic damage award was reversed as excessive.
The Wilsons, on the other hand, cite an unpublished California decision upholding an award of $38 million in combined economic and noneconomic damages, reduced by 50 percent due to the plaintiffs comparative fault, to a quadriplegic who was 53 years old, and an award to his wife of $13 million for loss of consortium. The Wilsons also cite a published decision by an appellate court in Indiana that upheld an award of $55 million in combined economic, noneconomic, and loss of consortium damages, already reduced by a finding that the plaintiff was 20 percent at fault, making the total award $66 million. (Ritter v. Stanton (Ind.Ct.App.2001) 745 N.E.2d 828, 833,857.)
A review of all of these cases shows a range between $1 million and $66 million in compensatory damages awards and substantial differences in the facts of each case. This demonstrates that while a comparison of other cases may give us a point of reference, ultimately our decision must be based on the evidence in this case.

d. Evidence in record that jury acted out of passion or prejudice

Perhaps the most important factor that we must consider in determining if the award of noneconomic damages is excessive, other than the amount of the award itself, is whether there is evidence in the record to support the defendants' claim that the jury acted out of passion or prejudice. In this case we have substantial evidence in the record that demonstrates the jury's award was the product of such improper emotions and therefore must be reduced.
In discussing economic damages in closing argument, counsel for the Wilsons argued that Mrs. Wilson suffered "an economic loss of $4.6 million dollars ..., based on the evidence that came before you." The jury awarded Mrs. Wilson that amount, and thus the reasonableness of her economic damages is not in dispute on appeal.
In discussing noneconomic damages in his closing argument, counsel for the Wilsons described some of the matters that could be included in such an award. This included past and future physical pain, mental suffering, and loss of enjoyment of life. Counsel then suggested a method for calculating these numbers, taking into account the past injury, as well as future injuries over her 33-year life expectancy. Following that discussion, counsel made the following statement: "I respectfully submit that if you look at the catastrophic injury that we have, the numbers there, they are probably three to four times the specials is what you are going to find. It's going to be fair, just and reasonable. And this is an awful lot of money. I know it is. It's a lot of money. But when someone says it's a lot of money, why are we doing this, you tell them it's a lot of pain. It's a loss of a human being's dignity and worth.... And I submit to you that there is no higher value than a good woman who is a good wife, a good mother, a good neighbor, that is out there helping others. And I can't put the number on it, *307 but I want you to be reasonable, just and fair, recognizing the humanity of this issue." (Italics added.) Thus, counsel was requesting the jury award noneconomic damages to Mrs. Wilson in an amount three to four times the amount they awarded in economic damages, or $13.8 to $18.4 million.
As to Mr. Wilson's loss of consortium claim, counsel argued that "it's probably going to be equated perhaps reasonably just to what the economic loss is for his noneconomic loss." Counsel was thus requesting that the jury award Mr. Wilson $4.6 million for his loss of consortium claim.
Next, addressing all the compensatory damages, the Wilsons' counsel stated the following:
"I invite defense counsel to address my discussion of damages. If he does not discuss damages in his closing, if he does not disagree with me, you can accept these numbers as reasonable and just and fair." (Italics added.)
Defense counsel did not address the issue of damages in closing argument.
When we compare these numbers to the amount the jury awarded, it is apparent the jury disregarded the Wilsons' counsel's own statements as to what was a reasonable amount to award in this case. On noneconomic damages to Mrs. Wilson, the jury awarded $105 million, or approximately 13 times the amount counsel represented was "fair, just and reasonable." The reduced award of approximately $65 million is still approximately three to five times that amount. The size of the award provides compelling evidence that the jury rejected what even the Wilsons' counsel believed was fair and reasonable and acted out of passion or prejudice.
The jury's award of loss of consortium damages also supports our conclusion. The jury awarded Mr. Wilson $13 million for his loss of consortium claim, or almost three times the amount the Wilsons' counsel requested.
The jury's complete rejection of the damages suggested by the Wilsons' counsel, a range for noneconomic damages and an amount for loss of consortium that counsel characterized as fair, reasonable and just, is compelling evidence the jury acted out of passion or prejudice. The fact the jury's award, and the award as remitted by the court, far exceeded, and had no relation to, the amounts requested by counsel suggests the jury was not acting as a fair and neutral trier of fact.
There was also a question posed by Ford's counsel, in light of Mrs. Wilson's catastrophic injuries, that may well have inflamed the passions of the jury significantly enough to result in the excessive damage award. Ford's trial counsel, in its last question on cross-examination of Mr. Wilson, posited the following:
"[Q] The silver lining, to the extent that there could be one, it has brought you and [Mrs. Wilson] and the family closer together? [¶] ...
"[A] I think where we were together before, we are together after. I don't think it's done more for us. I think it'sI don't think it's a benefit or a plus in any way. I am sorry, I don't think I can see it that way."
This question implied that the family should find a silver lining in what befell Mrs. Wilson. It may very well have been viewed as callous by the jury and might explain, in some manner, the actions of the jury in rendering a verdict so out of line with the amounts requested by the Wilsons' own counsel.

e. Our review of the record

In addition to considering the above factors, we have reviewed the record to determine *308 whether the award, as remitted by the court, is excessive. This includes reviewing the nature and extent of Mrs. Wilson's injuries, the testimony of lay and expert witnesses on damages and the damage award. Our own review of the record reveals the noneconomic damage award was excessive and was the product of passion or prejudice.

f. Conclusion

Based on all of the above factors, and utilizing our collective experience, we conclude the award of noneconomic damages to Mrs. Wilson, even as remitted by the court, was excessive, and the facts of this case instead support an award of $18 million, within the ratio/range requested by the Wilsons' counsel. As we have discussed, ante, the award, even as reduced by the trial court, far exceeds the amount suggested as reasonable, fair and just by the Wilsons' attorney. That is compelling evidence the jury acted out of "passion and prejudice" in awarding noneconomic damages. Further, although each case must be analyzed on its own facts, the award far exceeds any award we could locate that was upheld by a California appellate court.
However, the reduction to $18 million in noneconomic damages is in the range of one recent unreported decision in California where the award of such damages was upheld on appeal. Moreover, utilizing our collective experience, we conclude an award of $18 million in noneconomic damages is proportionate to Mrs. Wilson's substantial injuries, and is proportionate to the economic damages award. Considering the substantial nature of Mrs. Wilson's injuries, we conclude $18 million is a just and reasonable amount and an amount "`a reasonable person would estimate as fair compensation'" under the circumstances of this case. (Duarte v. Zachariah (1994) 22 Cal.App.4th 1652, 1665, 28 Cal.Rptr.2d 88.)
Ford summarily asserts the remitted award of $5 million for loss of consortium to Mr. Wilson was also excessive, citing cases with loss of consortium awards of $229,000 to $2.55 million. However, utilizing the same factors we considered above, and noting the devastating impact on Mr. Wilson's life that Ford's conduct has caused, we do not find the remitted award for loss of consortium to be excessive or the product of passion or prejudice. The amount to which the court reduced these damages approximates the amount suggested by the Wilsons' counsel.
To avoid further delay and expense to the parties, and because the record in this matter is sufficiently definite to determine the proper amount of noneconomic damages, we will remit the award of noneconomic damages to $18 million for Mrs. Wilson, conditioned on her acceptance of this reduced amount. If Mrs. Wilson does not agree to the reduced amount, the matter will be reversed and remanded for a new trial on the issue of noneconomic damages, as specified in California Rules of Court, rule 8.264(d).[10]

B. Due Process Considerations

Ford also asserts that the noneconomic damages award is "unconstitutionally excessive *309 as a matter of federal due process." Amicus curiae AAM makes the same argument, asserting that due process considerations applicable to punitive damages awards should also apply to compensatory damages. This contention is unavailing.
Ford and AAM ignore the fact that while the United States Supreme Court has in several recent decisions held that due process rights limit the amount of punitive damages that may be imposed upon an individual, a basic underpinning of those decisions was the very distinction between compensatory damages, which are designed to compensate the plaintiff, and punitive damages, which are in the nature of fines or sanctions, designed to punish and deter a defendant. For example, in State Farm Mut. Auto. Ins. Co. v. Campbell (2003) 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (State Farm), the majority opinion began its analysis by making just this distinction: "[I]n our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes. [Citation.] Compensatory damages `are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.' [Citations.] By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." After establishing this important distinction, the high court concluded that the "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." (State Farm, supra, 538 U.S. at p. 416, 123 S.Ct. 1513, italics added.) The court likened punitive damages to criminal penalties, imposed without the protections of a criminal trial: "Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding." (Id. at p. 417, 123 S.Ct. 1513.)
Ford and AAM cite no authority for the proposition that constitutional due process limitations applicable to punitive damages awards, as recently confirmed by the United States Supreme Court (see State Farm supra, 538 U.S. at p. 412, 123 S.Ct. 1513), also apply to compensatory damages awards. Nevertheless, AAM asserts that the rule applicable to punitive damages awards should be extended to noneconomic damage awards because (1) defendants need notice of their potential exposure to such liability that is imposed in a vague and standardless manner, and (2) the lack of concrete standards for such awards enables juries to pursue punitive goals in rendering such awards.
However, because noneconomic damages are not a punishment that serves to deter conduct, but rather compensation to make a plaintiff whole as a result of a defendant's conduct, uncertainty in the proof does not preclude their recovery: "`[O]nce the cause and existence of damages have been ... established [with reasonable certainty], recovery will not be denied because the damages are difficult of ascertainment.... The law only requires that the best evidence be adduced of which the nature of the case is capable[,] and the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision.'" (Dallman Co. v. Southern Heater Co. (1968) 262 Cal.App.2d 582, 594, 68 Cal.Rptr. 873, citations omitted; see also Speegle v. Board of Fire Underwriters (1946) 29 Cal.2d 34, 46, 172 P.2d 867 ["`The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty *310 [in fixing the amount of damages] which his own wrong has created'"].)
As the United States Supreme Court has noted, "`[T]he common law rule as it existed at the time of the adoption of the Constitution' was that `in cases where the amount of damages was uncertain[,] their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it.'" (Feltner v. Columbia Pictures Television, Inc. (1998) 523 U.S. 340, 353, 118 S.Ct. 1279, 140 L.Ed.2d 438; see also Barry v. Edmunds (1886) 116 U.S. 550, 565, 6 S.Ct. 501, 29 L.Ed. 729 ["nothing is better settled than [the principle] that, in ... actions for torts where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine the amount by their verdict"].) Thus, we are loath to usurp this core function of the jury by relying on quasi-mathematical formulas to assess the amount of damages that may be awarded, simply because noneconomic damages are not readily quantifiable.
Nor does the imagined danger that vague standards for imposing or reviewing noneconomic damage awards will lead juries to use such awards as punishment, as opposed to compensation, justify imposing due process limitations on such awards. The jury here was instructed it "must not let bias, sympathy, prejudice, or public opinion influence [their] decision." Although the jury was instructed that as to noneconomic damages "[n]o fixed standard exists for deciding the amount of these damages," it was also instructed that it "must use [their] judgment to decide a reasonable amount based on the evidence and [their] common sense." The jury was instructed that for future economic damages, "[Mrs.] Wilson must prove that she is reasonably certain to suffer that harm." The court, in instructing the jury on non-economic damages, also delineated the type of harm for which Mrs. Wilson could recover:
"Noneconomic damages may consist of the following: [¶] Past and future physical pain, past and future mental suffering, past and future enjoyment of life, past and future disfigurement, past and future physical impairment, past and future inconvenience, past and future grief, past and future anxiety, past and future humiliation, past and future emotional distress."
Thus, under these instructions juries are given guidance as to the proper matters they may consider in making an award of noneconomic damages. These guideposts protect against the purported danger that juries might use such an award to punish a defendant.
Moreover, to the extent that a jury's award of noneconomic damages is challenged as excessive, the judge, sitting as a 13th juror, will then review the evidence to determine if the award should be remitted. The trial judge is not limited to setting aside an excessive damage award based on evidence the jury acted out of passion or prejudice. Rather, "`it is within the sound discretion of the trial court in ruling upon a motion for a new trial on the ground of excessive damages, to grant the same when there is a substantial conflict in the evidence regarding the extent of the damage.'" (Hughes v. Hearst Publications, Inc. (1947) 79 Cal.App.2d 703, 705, 180 P.2d 419.) This rule gives defendants a further check against excessive awards of noneconomic damages.
Finally, the "passion or prejudice" standard under which appellate courts review such awards also protects against excessive awards. It is true that recent cases have stated that awards for emotional distress can in some instances have a punitive element. (Gober v. Ralphs Grocery Co. *311 (2006) 137 Cal.App.4th 204, 223, 40 Cal. Rptr.3d 92 (Gober); State Farm, supra, 538 U.S. at p. 426, 123 S.Ct. 1513.) However, here we reviewed the record and determined the evidence supported an award of $18 million, the award was within the range for similar cases, and it was proportionate to Mrs. Wilson's substantial injuries and economic loss. By reducing the noneconomic damages to $18 million, we have effectively eliminated that portion of the award that was the product of passion or prejudice, and no punitive element remains.
AAM relies heavily upon a law review article for its position that the vague standards for quantifying noneconomic damage awards justify imposing federal due process constraints on such awards. However, the author of that article concluded that the solution to such unchecked awards is limits or standards imposed by legislatures, not application of due process notions to compensatory awards. (Niemeyer, Awards for Pain and Suffering: The Irrational Centerpiece of Our Tort System (2004) 90 Va. L.Rev. 1401, 1414, 1417-1418.)
Ford and AAM cite one out-of-state authority that states in a footnote "[a] grossly excessive award for pain and suffering may violate the Due Process Clause even if it is not labeled `punitive.'" (Gilbert v. DaimlerChrysler Corp. (2004) 470 Mich. 749, 685 N.W.2d 391, 400, fn. 22.) However, that court expressly declined to address this constitutional issue and therefore it is not authority for the proposition cited. (Ibid, ["there is no need to reach this constitutional question"].)
We conclude it is not necessary to impose federal due process principles to limit noneconomic damage awards because (1) the Supreme Court in State Farm, supra, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, imposed due process limits on punitive damages awards because they are similar to criminal penalties, without the protections afforded defendants in criminal proceedings, and noneconomic damages are designed to compensate, not punish, a defendant; (2) the defendants have adequate notice of potential awards; and (3) the review accorded damage awards by trial and appellate courts ensures there is no punitive element in noneconomic damage awards.

III. PUNITIVE DAMAGES

Ford asserts the punitive damages award must be reversed because (1) the Wilsons only proved that reasonable people could disagree regarding the design decisions made by Ford; (2) it complied with all applicable governmental standards; (3) it was improper to admit evidence of Ford's overall financial condition; and (4) the award is excessive under federal and California law.
On remand from the United States Supreme Court, with directions that we reconsider Buell-Wilson I in light of Philip Morris, supra, ___ U.S. ____, 127 S.Ct. 1057, 166 L.Ed.2d 940, Ford asserts (1) it is entitled to a new trial because there is a "significant risk" the punitive damages verdict against it was based on improper evidence and arguments concerning third party harm; (2) the punitive damages award was barred because Ford's Conduct was objectively reasonable; (3) Philip Morris requires a further reduction in the punitive damages award; and (4) we should revisit our ruling excluding industry custom and practice evidence.
We reiterate our original holding that the punitive damages award, as remitted by the trial court, is excessive and reduce it to $55 million. We reject the remainder of Ford's contentions. We also decline Ford's (and amici curiaes') request that we *312 reconsider our original holdings on the trial court's evidentiary rulings, the emotional distress damages, and issues related to the punitive damages award other than whether that award improperly punished Ford for harm to third parties. The United States Supreme Court's direction to this court was to reconsider our original decision "in light of Philip Morris." (Ford Motor Co. v. Buell-Wilson (2007) ___ U.S. ___, 127 S.Ct. 2250, 167 L.Ed.2d 1087.) The only issue decided by Philip Morris was whether and when third party harm could be considered in imposing punitive damages. Based on our analysis of Philip Morris, our review of Buell-Wilson I, and the proceedings in the trial court, we conclude that nothing in Philip Morris requires us to reconsider the remainder of our original decision.

A. The "Reasonable People Can Disagree" Argument

1. Standard of Review

We review an award of punitive damages to determine if there is substantial evidence that supports a finding by clear and convincing evidence that a defendant acted with fraud, malice or oppression. (Mike Davidov Co. v. Issod (2000) 78 Cal.App.4th 597, 606, 92 Cal.Rptr.2d 897.)

2. Analysis

In this case the Wilsons presented evidence, which the jury accepted, that Ford knew of dangerous instability defects in the Explorer. Ford's own testing showed that the Explorer was unstable and prone to rollover on flat dry pavement at less than highway speeds. Ford knew before the Explorer was released for sale that the same instability characteristics in that vehicle led to serious injuries to Bronco II drivers. The Wilsons presented evidence that Ford knew that the Explorer's roof was weak and that roof crush caused injury during rollover accidents. Ford had the technology to make the Explorer stable and strengthen the roof, but did not use it. The modifications to strengthen the roof was weak have cost approximately $20 per vehicle. This evidence constitutes substantial evidence to support the jury's decision to award punitive damages.
Ford asserts, however, that because there was a "reasonable disagreement" among experts concerning the propriety of its design decisions it cannot, as a matter of law, be subject to punitive damages. We reject this contention.
The Wilsons presented expert testimony concerning the design and safety issues of the Explorer. Ford presented contrary expert testimony. The jury rejected the testimony of Ford's experts, as it was entitled to do. Ford's assertion that punitive damages are not allowed unless all experts agree there were improper design decisions is unavailing. If such an assertion were true, punitive damages would never be allowed in cases where the defendant simply had an expert who disagreed with the plaintiffs expert.
Moreover, the California cases cited by Ford on this issue do not support its position. They were cases where there was simply a failure of proof to support a punitive damages award. (See Lusardi Construction Co. v. Aubry (1992) 1 Cal.4th 976, 996-997, 4 Cal.Rptr.2d 837, 824 P.2d 643; Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co. (2001) 90 Cal.App.4th 335, 348, 350, 108 Cal.Rptr.2d 776, fn. 10 (Chateau Chamberay); Mason v. Mercury Cas. Co. (1976) 64 Cal.App.3d 471, 474-475, 134 Cal.Rptr. 545; Kwan v. Mercedes-Benz of North America, Inc. (1994) 23 Cal.App.4th 174, 184-185, 28 Cal.Rptr.2d 371; Stewart v. Truck Ins. Exchange (1993) 17 Cal. App.4th 468, 483-484, 21 Cal.Rptr.2d 338.)
*313 Ford also asserts there was no evidence any of Ford's decision makers believed the Explorer's design presented an unreasonable risk of injury, presenting the jury with only the "bare and illogical `inference' that unnamed Ford officials `must have' acted with malice...." However, the Wilsons presented direct and substantial evidence of Ford management's recognition of the safety implications of their design decisions. As discussed in detail in the factual background, ante, there is substantial evidence that Ford's decision makers knew how to make the Explorer less dangerous, but chose not to because of financial considerations. Ford's "reasonable people can disagree" argument is unavailing.
PLAC supports Ford's arguments regarding disagreements among experts as a defense to punitive damages, asserting that where there are contemporaneous disagreements among experts regarding design decisions, punitive damages should be barred. However, PLAC cites no California authority for such a proposition. The California case law PLAC cites involves the well-established rule in insurance bad faith cases that an insurer cannot be liable for bad faith if there is an objectively reasonable dispute about coverage. (See, e.g., Chateau Chamberay, supra, 90 Cal. App.4th at pp. 347-348, 108 Cal.Rptr.2d 776; Fraley v. Allstate Ins. Co. (2000) 81 Cal.App.4th 1282, 1293, 97 Cal.Rptr.2d 386.) However, these cases state a substantive standard of liability for insurance claims and do not address when it is proper to impose punitive damages. Notably, PLAC has cited no California product liability case where expert disputes concerning design provide a defense to punitive damage liability or, for that matter, liability in its entirety.
In a footnote, PLAC also cites several out-of-state cases for the proposition that a contemporaneous disagreement among experts bars liability for punitive damages. However, several of these cases simply do not state such a proposition. Rather, some stand for the proposition that expert disagreement is merely one factor that could be considered in assessing the propriety of punitive damages awards. (Loitz v. Remington Arms Co., Inc. (1990) 138 Ill.2d 404 [563 N.E.2d 397, 406-07, 150 Ill.Dec. 510]; Owens-Corning Fiberglas Corp. v. Garrett (1996) 343 Md. 500 [682 A.2d 1143, 1158-1168]; Satcher v. Honda Motor Co. (5th Cir.1995) 52 F.3d 1311, 1316-1317.)
PLAC does cite two cases from Iowa that hold a reasonable disagreement among experts about the adequacy of design was a defense to punitive damages. (Mercer v. Pittway Corp. (Iowa 2000) 616 N.W.2d 602, 618; Hillrichs v. Avco Corp. (Iowa 1994) 514 N.W.2d 94, 100.) However, no case from any other state has cited these cases with approval, and we could not locate any other state that follows such a "rule." Because these cases apply Iowa law, we are not bound by their holdings and decline to adopt such a rule in California.
PLAC also argues that punitive damages should be barred where there was a contemporaneous expert opinion that a product design that caused a plaintiff injury was necessary to avoid greater injuries of other kinds. This contention is unavailing.
First, this argument by PLAC focuses only on Ford's decisions regarding the Explorer's stability. There is no assertion that Ford allowed the roof defect to exist because changing the design would create a greater risk of other injuries. Because the roofs crashworthiness provided an independent basis for the award of punitive damages, this argument fails.
*314 Second, PLAC cites to no evidence in the record to suggest that any member of Ford's management rejected changes to the Explorer's stability design because to do so would create a greater risk of injury in another manner. Rather, it only cites to statements made in Ford's brief that imply such a rationale, but Ford's statements are not supported by the cited record.
As such, Ford and PLAC's "reasonable people can disagree" argument is unavailing.

B. Compliance with Government Standards

Ford and amicus curiae the Chamber assert Ford is not subject to punitive damages as a matter of law because it complied with all applicable governmental regulatory standards. In particular, Ford asserts it complied with FMVSS (Federal Motor Vehicle Safety Standard) 216, which sets the standard for crush resistance of automobile roofs. Ford also asserts it complied with a National Highway Traffic Safety Administration (NHTSA) regulation requiring all SUV's to display a warning concerning the risk of rollovers. (See 49 Fed.Reg. 20016 (May 11, 1984).) Ford's and the Chamber's contentions are unavailing for several reasons.
The law in California is that punitive damages are permitted in product liability actions precisely because "[governmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products. [Citations.] Punitive damages thus remain as the most effective remedy for consumer protection against defectively designed mass produced articles." (Grimshaw, supra, 119 Cal.App.3d at p. 810, 174 Cal. Rptr. 348.) Compliance with a law or safety regulation in itself does not establish that a product is not defective or that a defendant who sells or rents the product for use by the public has exercised due care. (See Campbell v. General Motors Corp. (1982) 32 Cal.3d 112, 126-127, 184 Cal.Rptr. 891, 649 P.2d 224; Amos v. Alpha Property Management (1999) 73 Cal. App.4th 895, 901, 87 Cal.Rptr.2d 34.)
The Chamber asks us to reject the rule stated above in Grimshaw, supra, 119 Cal. App.3d 757, 174 Cal.Rptr. 348, that compliance with industry standards does not bar punitive damages, because that decision predates amendments to Civil Code section 3294 that modified the definitions of "oppression, fraud [and] malice" and required proof by clear and convincing evidence. But Grimshaw did not base its conclusions on the standard of proof for punitive damages claims or the precise definitions of the terms "oppression, fraud and malice." The Chamber points to nothing in the 1987 amendments, or to any legislative history for those amendments, suggesting the Legislature intended to disapprove Grimshaw.
The Chamber relies on the extensive federal regulation of the automobile industry through the NHTSA and the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act) (49 U.S.C. § 30101 et seq.), which, in conjunction with NHTSA-promulgated standards, has declared the minimum safety standards for automobiles. However, a review of the Safety Act and its legislative history demonstrates the federal government did not intend to preclude punitive damages where an auto manufacturer has met minimum safety standards.
Title 49 United States Code section 30103(e) (section 30103(e)) of the Safety Act contains a savings clause that provides:

*315 "Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." (Italics added.)
Thus, section 30103(e) expressly provides that compliance with federal safety standards is not a defense to state common law products liability. Punitive damages have long been a part of the common law, originating in the 1763 English case Huckle v. Money (1763) 95 Eng.Rep. 768, and finding early acceptance in the United States when the United States Supreme Court upheld their constitutionality in Day v. Woodworth (1851) 54 U.S. (13 How.) 363, 370, 14 L.Ed. 181. Thus, in enacting this savings clause, Congress was aware that part of the common law to which it referred in section 30103(e) included liability for punitive damages and could have excluded such damages from its terms.
The Chamber asserts that Congress, in enacting the savings clause in section 30103(e), only sought to preserve common law liability in general and did not intend to address punitive damages. However, a review of the legislative history of the Safety Act further demonstrates that Congress intended through the savings clause to leave untouched all aspects of common law products liability actions, including awards of punitive damages.
The House Report for the Safety Act states that section 30103(e) "is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those related to warranty, contract, and tort liability." (H.R.Rep. No. 1776-89, 2d Sess., p. 24 (1966), italics added.) The Safety Act's Senate sponsor stated on the Senate floor that "[c]ompliance with Federal standards would not necessarily shield any person from broad liability at the common law. The common law on product liability still remains as it was." (Remarks of Sen. Magnuson, 89 Cong. Rec. 14230 (daily ed. June 24, 1966), italics added.) Its House sponsor, while arguing in floor debate against the need for criminal penalties in the Safety Act stated, "[W]e have preserved every single common law remedy that exists against a manufacturer for the benefit of a motor vehicle purchaser. This means that all of the warranties and all of the other devices of common law which are afforded to the purchaser, remain in the buyer and they can be exercised against the manufacturer." (Remarks of Rep. Staggers, 89 Cong. Rec. 19663 (daily ed. Aug. 17, 1966), italics added.)
The fact that California does not follow this proposed rulethat compliance with federal minimum safety standards bars claims for punitive damagesis also demonstrated by the fact such a rule has been proposed through legislation in California on several occasions but has not been enacted. In 2000 the Legislature considered a bill that would have enacted the rule that Ford proposes. (Assem. Bill No. 2582 (1999-2000 Reg. Sess.) § 1.) However, the bill never made it out of committee. (Assem. Bill No. 2582, from committee without further action, 2 Assem. Final Hist. (1999-2000 Reg. Sess.) p. 1865.) A similar bill did not secure passage in 1996. (Assem. Bill No. 2880, from committee without further action, Assem. Final Hist. (1995-1996 Reg. Sess.) p. 1711.) Another such bill did not pass in 2006. (Sen. Bill No. 1429 (2005-2006 Reg. Sess.) § 2.) There would be no need for such legislation if compliance with government standards already provided a defense to punitive damages claims.
Ford and the Chamber's argument is also unavailing because there are no federal standards for stability of vehicles, one ground upon which Ford's liability *316 for punitive damages is based. Ford points to an NHTSA regulation requiring all SUV's to display a warning concerning the risk of rollovers. (See 49 Fed.Reg. 20016 (May 11, 1984).) However, having a warning sticker is not the same as meeting a safety standard, and, in any event, it would not bar a state law claim alleging stability defects.
The Chamber asserts that NHTSA's failure to promulgate stability standards and to require only a warning sticker represents a "policy choice" based on difficulties in predicting rollover risk and that compliance with the warning requirement alone should bar punitive damages. However, this exact argument was rejected by the Eleventh Circuit in Watkins v. Ford Motor Co. (11th Cir.1999) 190 F.3d 1213, 1216-1218, a Bronco II rollover case. (See also Ford Motor Co. v. Ammerman (Ind. Ct.App.1999) 705 N.E.2d 539, 555-556.) We conclude Ford's asserted compliance with federal safety regulations does not as a matter of law bar the punitive damages award.[11]

C. Fair Notice of Exposure to Punitive Damages

Ford contends that if punitive damages can be awarded on this record, Civil Code section 3294 is unconstitutionally vague because it failed to give Ford fair notice that its conduct could subject it to punitive damages. This contention is also unavailing.
Ford made this same argument over 25 years ago in Grimshaw, supra, 119 Cal. App.3d 757, 174 Cal.Rptr. 348. The Court of Appeal rejected it, concluding that "punitive damages are recoverable in a nondeliberate or unintentional tort where the defendant's conduct constitutes a conscious disregard of the probability of injury to others." (Id. at p. 811, 174 Cal.Rptr. 348.)
Additionally, Ford bases this contention on the fact that, at most, reasonable people could disagree with the decisions it made. However, we have already discussed and rejected this argument, ante.

D. Consideration of Ford's Overall Financial Condition

Ford asserts that the punitive damages award must be reversed because the jury was allowed to consider its overall financial worth (almost $13 billion) as opposed to its worth tied to sales of products in California. We reject this contention.
Where the defendant's oppression, fraud or malice has been proven by clear and convincing evidence, California law permits the recovery of punitive damages "for the sake of example and by way of punishing the defendant." (Civ.Code, § 3294, subd. (a).) As our Supreme Court recently held in Simon v. San Paolo U.S. Holding Co., Inc. (2005) 35 Cal.4th 1159, 1185, 29 Cal.Rptr.3d 379, 113 P.3d 63 (Simon): "[T]he defendant's financial condition is an essential factor in fixing an amount that is sufficient to serve these goals without exceeding the necessary level of punishment. `[O]bviously, the function of deterrence ... will not be served if *317 the wealth of the defendant allows him to absorb the award with little or no discomfort.' [Citation.] `[P]unitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.'" (See also State Farm, supra, 538 U.S. at p. 428, 123 S.Ct. 1513 [use of wealth as a factor not "`unlawful or inappropriate'"].)
Despite this authority, however, Ford cites People ex rel. Lockyer v. R.J. Reynolds Tobacco Co. (2004) 116 Cal.App.4th 1253, 11 Cal.Rptr.3d 317 (R.J. Reynolds) for the proposition that in assessing punitive damages courts may only take into consideration the defendant's financial figures in the state where the wrong occurred.
In R.J. Reynolds, the State of California filed a complaint against the defendant tobacco company to enforce a consent decree entered into as part of a settlement agreement that prohibited targeting youth in advertising of tobacco products. The superior court found the defendant in violation of that agreement and entered summary judgment, permanently enjoining the company from continuing to violate the settlement. The court also awarded the state sanctions in the amount of $20 million. The defendant appealed, and this court reversed the award of sanctions, finding them to be excessive. Relying on recent United States Supreme Court precedent holding it was improper to impose punitive damages against a defendant for conduct in one state based on defendant's out-of-state conduct, we held the superior court in R.J. Reynolds erred when it based its sanctions award on the defendant's nationwide spending on advertising, as opposed to its advertising activities in California. (R.J. Reynolds, supra, 116 Cal. App.4th at pp. 1289-1290, 11 Cal.Rptr.3d 317.) This court found the sanctions award to be error because "the People's request for $20 million in sanctions was based on Reynolds's nationwide spending on print advertising and profitability without evidence of its advertising spending or profitability in California." (Id. at p. 1290, 11 Cal.Rptr.3d 317.) As the court stated in R.J. Reynolds, "the award of sanctions for Reynolds's conduct in California could not properly be based on Reynolds's nationwide financial figures without violating Reynolds's due process rights." (Id. at p. 1289, 11 Cal.Rptr.3d 317.)
Based on the above quoted language, Ford asserts that it was error to allow evidence of its overall financial condition, as opposed to its financial worth in California. This contention is unavailing.
Here, the trial court properly instructed the jury, at Ford's request, that it could not consider Ford's out-of-state conduct in imposing punitive damages:
"In determining the amount of punitive damages, if any, that is necessary to achieve the proper level of punishment and deterrence, you may consider only Ford's wrongful conduct, if any, that has had an adverse impact on the citizens of California. Accordingly, you may not award any punitive damages for the purpose of punishing Ford for the sale of vehicles in other states for any injuries that may have occurred in other, states, or for the purpose of changing Ford's conduct in other states."
Consideration of Ford's overall financial condition was not to punish it for-out-of-state conduct as in R.J. Reynolds, but for the broader concept of ensuring the amount of punitive damages was sufficient to act as a deterrent. Use of a defendant's financial condition in such a manner is proper because "`the function of deterrence ... will not be served if the wealth of the defendant allows [it] to absorb the *318 award with little or no discomfort.'" (Simon, supra, 35 Cal.4th at p. 1185, 29 Cal. Rptr.3d 379, 113 P.3d 63.) Consideration of only a defendant's finances as they relate to the state in which they are sued would allow the defendant to make them "`a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.'" (Ibid.)

E. Amount of Award

Ford argues that the amount of the punitive damages awarded to the Wilsons is excessive under the federal due process clause of the 14th Amendment to the United States Constitution. We conclude that, after reducing the noneconomic damages award to Mrs. Wilson to $18 million, the award of punitive damages is excessive and is, therefore, reduced to $55 million, an approximate two-to-one ratio to the total compensatory damages award ($4.6 million in economic damages + $18 million in noneconomic damages + $5 million in loss of consortium damages = $27.6 million x 2 = $55.2 million).

1. Standard of review

"In deciding whether an award of punitive damages is constitutionally excessive ..., we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This `[e]xacting appellate review' is intended to ensure punitive damages are the product of the `"`application of law, rather than a decisionmaker's caprice.'"' [Citation.] [¶] On the other hand, findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (Simon, supra, 35 Cal.4th at p. 1172, 29 Cal.Rptr.3d 379, 113 P.3d 63, fn. omitted.)
`To state a particular level beyond which punitive damages in a given case would be grossly excessive, and hence unconstitutionally arbitrary,'"is not an enviable task.... In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment."'" (Simon, supra, 35 Cal.4th at p. 1188, 29 Cal.Rptr.3d 379, 113 P.3d 63.) Moreover, our "constitutional mission is only to find a level higher than which an award may not go; it is not to find the `right' level in the court's own view." (Ibid.)

2. Analysis

The United States Supreme Court has determined that the federal due process clause places limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards. (State Farm, supra, 538 U.S. at pp. 416-418, 123 S.Ct. 1513.) The imposition of "grossly excessive or arbitrary" awards is constitutionally prohibited, for due process entitles a tortfeasor to "`fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'" (Id. at pp. 416, 417,123 S.Ct. 1513.)
In State Farm the United States Supreme Court concluded it was improper for juries, in awarding punitive damages, to punish a defendant for its dissimilar actions in other states affecting individuals other than the plaintiff. (State Farm, supra, 538 U.S. at pp. 421-423, 123 S.Ct. 1513.) However, the Supreme Court reiterated that, in determining the reprehensibility of a defendant's actions, juries could *319 consider a defendant's similar repeated conduct that affected others. (Id. at p. 423,123 S.Ct. 1513.)
The United States Supreme Court and the California Supreme Court have stated there are three factors to consider in determining whether the amount of a punitive damages award comports with the federal due process clause: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the ... harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages [and comparable civil penalties where available]." (State Farm, supra, 538 U.S. at p. 418, 123 S.Ct. 1513; Johnson v. Ford Motor Co. (2005) 35 Cal.4th 1191, 29 Cal. Rptr.3d 401, 113 P.3d 82 (Johnson).) We discuss these factors in order.

a. Reprehensibility of conduct

Courts utilize five factors to help determine the degree of reprehensibility of a defendant's conduct: (1) whether the harm was physical and not merely economic; (2) whether the conduct demonstrated an indifference or reckless disregard for the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct was repeated or an isolated incident; and (5) whether the conduct was the result of intentional acts or mere accident. (State Farm, supra, 538 U.S. at p. 419, 123 S.Ct. 1513; Simon, supra, 35 Cal.4th at p. 1180, 29 Cal.Rptr.3d 379, 113 P.3d 63.) Further, the reprehensibility of a defendant's conduct is the most important indicator of the reasonableness of a punitive damages award. (State Farm, supra, at p. 419, 123 S.Ct. 1513; Simon, supra, at p. 1180, 29 Cal.Rptr.3d 379, 113 P.3d 63.)
Based on our de novo review of the record, we conclude that the reprehensibility of Ford's conduct was high, given the catastrophic nature of Mrs. Wilson's injuries, Ford's reckless disregard for the safety of others, the repeated nature of Ford's conduct, and the fact that Ford's acts were intentional.
Focusing on the first factor, Ford's decision to release the defective Explorer resulted in catastrophic and permanent physical injuries to Mrs. Wilson, not merely economic loss. She is permanently paralyzed and in constant, debilitating pain. She is confined to a wheelchair, without sensation or muscular control of her lower body. She must rely on others to care for her. As Mrs. Wilson explained it:
"Me being dependent on other people ... for me that is very difficult because I have always been an independent sort of person.... I have always been the one that has done things for other people. For me that is very hard to ... have to be in that kind of position.... I am in a wheelchair, I am not going to ever be out of a wheelchair, that whole concept is very ... difficult to ... accept.... The things that I really love to do I can't do anymore. The list is just goes on and on."
As discussed, ante, and as found by the jury, Ford's decision to release the defective Explorer without warning consumers of the risk of injury it posed evinced a reckless disregard for the safety of its customers. As the trial court noted in ruling on Ford's motion for new trial on the ground the punitive damage award was excessive, "the evidence showed Ford had a pattern of deficient design regarding safety in favor of increased financial returns and was the result of the conscious disregard of Ford executives." Our own independent review of the record compels the same conclusion. Thus, the second factor also supports a significant punitive damages award.
*320 Addressing the third factor, the target of the conduct in this case was consumers, individuals who were vulnerable as they would not understand vehicle design, development and manufacture, and would rely on Ford to inform them of risks as they made purchasing decisions.
Conduct is more reprehensible where, as here, it is part of repeated corporate policy or practice rather than an isolated incident. (Johnson, supra, 35 Cal.4th at p. 1196, 29 Cal.Rptr.3d 401, 113 P.3d 82.) In this case the conduct was repeated and not an isolated incident. Ford had a pattern of deficient safety design that was ignored in favor of increased financial returns. As discussed in more detail, ante, that corporate policy or practice was evidenced by Ford's refusal to follow its engineers' recommendations to improve the stability of the Explorer. As the trial court noted, "[T]hat evidence was primarily adduced through Ford's own internal memoranda and correspondence." Thus, the fourth factor supports a large punitive damages award.
The evidence presented by the Wilsons in this case supports a finding that Ford's actions were the result of intentional conduct and deliberate decisions by Ford's management, knowing the unreasonable risk of harm posed to consumers, as opposed to a mere accident.
Moreover, the fifth factor, whether the conduct was the result of intentional acts or mere accident, "is of little value in assessing a California punitive damages' award, as accidentally harmful conduct cannot provide the basis for punitive damages under our law. At a minimum, California law requires conduct done with Villful and conscious disregard of the rights or safety of others' or despicable conduct done `in conscious disregard' of a person's rights." (Simon, supra, 35 Cal.4th at p. 1181, 29 Cal.Rptr.3d 379, 113 P.3d 63.) The jury's finding that Ford acted with "oppression, fraud or malice" demonstrates Ford's actions were intentional. In sum, the reprehensibility of Ford's conduct supports a significant award of punitive damages.

b. Ratio of punitive to compensatory damages

In State Farm, the United States Supreme Court, while still "declin[ing] ... to impose a bright-line ratio which a punitive damages award cannot exceed," held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (State Farm, supra, 538 U.S. at p. 425, 123 S.Ct. 1513.) The high court "also explained that past decisions and statutory penalties approving ratios of 3 or 4 to 1 were `instructive' as to the due process norm, and that while relatively high ratios could be justified when `"a particularly egregious act has resulted in only a small amount of economic damages" [citation] ... [t]he converse is also true[:] When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."' (Simon, supra, 35 Cal.4th at p. 1182, 29 Cal.Rptr.3d 379, 113 P.3d 63.)
Our high court has interpreted this language from State Farm to mean that it established a "type of presumption: ratios between the punitive damages award and the plaintiffs actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause." (Simon, supra, 35 Cal.4th at p. 1182, 29 Cal. Rptr.3d 379, 113 P.3d 63.)
*321 Here, after our reduction of the noneconomic damages awarded to Mrs. Wilson, the compensatory damages, while substantial, are within a reasonable range for the type of catastrophic, permanent and ongoing injuries suffered by Mrs. Wilson, and the loss of her society, comfort and companionship to Mr. Wilson. Mrs. Wilson's recovery for noneconomic damages is proportionate to the injuries she suffered. Similarly, Mr. Wilson's recovery on his loss of consortium claim is proportionate to his substantial injury. Moreover, as discussed, ante, there was a high degree of reprehensibility to Ford's conduct. Because the noneconomic damages award is substantial, a low single digit ratio is appropriate. We are mindful of the Supreme Court's statement in State Farm, supra, 538 U.S. at page 425, 123 S.Ct. 1513, that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." In this case we conclude that a two-to-one ratio is warranted because the degree of Ford's reprehensibility is also high.

c. Comparable civil penalties

Ford does not address this factor in its opening brief. However, for the first time in its reply brief Ford asserts that there are comparable civil penalties to compare with the amount of the punitive damages claim. Ford cites title 49 United States Code section 30165(a), which it claims provides penalties for designing and selling defective vehicles, penalties that are $1,000 for each vehicle, up to a maximum of $800,000. Ford asserts that since the punitive damages award "dwarfs" the maximum penalties allowed under that federal statute, the punitive damage award is constitutionally infirm. This contention is unavailing.
First, we do not consider matters raised by appellants for the first time in their reply briefs. Because Ford did not address this factor in its opening brief, thus denying the Wilsons an opportunity to respond, it has waived the right to assert this issue on appeal. (Julian v. Hartford Underwriters Ins. Co. (2005) 35 Cal.4th 747, 761, fn. 4, 27 Cal.Rptr.3d 648, 110 P.3d 903; Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal.App.4th 847, 894, fn. 10, 93 Cal.Rptr.2d 364.)
Second, title 49 United States Code section 30165(a) is part of that portion of the Safety Act which provides, as discussed, ante, only minimum safety standards.
Third, as also discussed in detail, ante, there is a savings clause that allows common law liability notwithstanding compliance with those standards, putting Ford on notice it may be subject to private state actions that result in substantially higher damage awards than civil penalties.
Fourth, the savings clause also evidences congressional intent that the maximum penalty allowed under title 49 United States Code section 30165(a) is not a sufficient penalty for all such violations because the varying degrees of plaintiffs' injuries and defendants' culpability dictate a greater flexibility in punishment. (See Ford Motor Co. v. Sperau (Ala.1997) 708 So.2d 111, 122.)
Finally, the sanctions amounts in title 49 United States Code section 30165(a) were increased in 2000 to a range of $5,000 to $15 million, indicating Congress's belief that the original amounts were insufficient to deter vehicle manufacturers from placing defective automobiles on the road. The maximum penalty under the 2000 amendments is not "dwarfed" by the punitive damage award, as reduced.

*322 d. Conclusion

Based on the foregoing factors, and using our combined experience and judgment, we conclude that a two-to-one ratio of punitive damages to compensatory damages is sufficient to punish Ford and deter it from similar conduct in the future. This ratio is proportionate to the degree of harm suffered and the substantial award of compensatory damages. An award exceeding a two-to-one ratio would exceed the constitutional maximum that could be awarded under the facts of this case. (Simon, supra, 35 Cal.4th at p. 1188, 29 Cal. Rptr.3d 379, 113 P.3d 63 [an appellate court's "constitutional mission is only to find a level higher than which an award may not go; it is not to find the `right' level in the court's own view"].) Accordingly, we reduce the punitive damage award to $55 million, approximately two times the total compensatory damage award to the Wilsons.

F. Application of Philip Morris to Reduced Punitive Damages Award

1. Introduction

The United States Supreme Court has remanded this matter with direction that we reconsider our award of punitive damages in light of the high court's decision in Philip Morris, supra, ___ U.S. at pages ___-___, 127 S.Ct. at page 1063, 166 L.Ed.2d at pages 948-949, holding juries cannot use punitive damages to punish defendants for harm caused to third parties.
We have reconsidered our original decision in Buell-Wilson I and have analyzed the application of Philip Morris to our holdings in that decision. We have also reviewed and analyzed the relevant trial court proceedings in this matter. Based on that reconsideration, review, and analysis, we conclude Philip Morris does not necessitate a change in our original decision in this matter because (1) Ford has forfeited the right to raise the issue whether there is significant risk the jury, in determining the amount of punitive damages to award, punished Ford for harm it caused to third parties; (2) our previous reduction of the punitive damages award to two times the compensatory award eliminated any danger the jury punished Ford for harm to third parties; and (3) there was no evidence or argument at trial that created a significant risk the jury here punished Ford for harm to third parties.

2. Philip Morris

The family of Jesse Williams, a long-time smoker, sued Philip Morris USA (Philip Morris) for negligence and deceit. (Philip Morris, supra, ___ U.S. at p. ___, 127 S.Ct. at p. 1060, 166 L.Ed.2d at p. 946.) The jury concluded Williams's death was caused by smoking and found for the plaintiffs on their claims for negligence and deceit. On plaintiffs' claim for deceit, the jury awarded $821,000 in compensatory damages and $79.5 million in punitive damages. The trial judge determined the punitive damages award was excessive and reduced it to $32 million. Both parties appealed, and the Oregon Court of Appeals reinstated the full award of punitive damages. (Ibid.) The Oregon Supreme Court denied review.
Philip Morris appealed to the United States Supreme Court, and the case was remanded for further review in light of the Supreme Court's decision in State Farm, supra, 538 U.S. 408, 123 S.Ct. 1513, which held, as we have discussed, ante, that the due process clause of the United States Constitution imposes limits on the amount a jury may award for punitive damages. Philip Morris raised two arguments on remand: (1) The jury should not have been permitted to consider injuries to third parties not before the court when awarding punitive damages, and (2) the punitive *323 damages award was excessive under State Farm. (Philip Morris, supra, ___ U.S. at p.___, 127 S.Ct. at p. 1061, 166 L.Ed.2d at p. 946.) The Oregon Supreme Court rejected both arguments, and Philip Morris again appealed to the United States Supreme Court.
In Philip Morris, the United States Supreme Court held Philip Morris's rights under the due process clause of the Fourteenth Amendment were violated when the jury considered harm to third parties as a factor when determining the amount of punitive damages, because the "Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties...." (Philip Morris, supra, ___ U.S. at p. ____, 127 S.Ct. at p. 1063, 166 L.Ed.2d at p. 948.) The Supreme Court concluded that such punishment violates the rule that a state must afford a defendant an opportunity to present every available defense. (Ibid.) A defendant "threatened with punishment for injuring a nonparty victim" may be unable to present defenses applicable to the nonparty victim if those defenses do not also coincide with those relevant to the plaintiffs claim. (Ibid.)
Philip Morris also emphasized, however, that a plaintiff may offer evidence of "harm to other victims" to show the reprehensibility of a defendant's conduct. (Philip Morris, supra, ___ U.S. at pp. ___-___, 127 S.Ct. at p. 1064, 166 L.Ed.2d at pp. 949-950.) Reiterating its holding in State Farm, the Supreme Court held "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." (Philip Morris, supra, ___ U.S. at p. ____, 127 S.Ct. at p. 1064, 166 L.Ed.2d at p. 949.) "[A] jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." (Id. at pp. ___-___, 127 S.Ct. at p. 1064, 166 L.Ed.2d at pp. 949-950.) Where there is a "significant" risk that the jury might do so "because, for example, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jurya court, upon request, must protect against that risk." (Id. at p.___, 127 S.Ct. at p. 1065, 166 L.Ed.2d at p. 951, italics added.)

3. Forfeiture

a. Jury instructions and arguments at punitive damages phase of trial

(1) Ford's proposed Special Jury Instruction Nos. 19 & 21

At the bifurcated punitive damages phase of the trial, Ford proposed Special Jury Instruction No. 21, instructing the jury not to consider third party harm for any purpose:
"In determining the appropriate amount of punitive damages, if any, in this case, you may consider only the harm to the plaintiffs. Any individuals other than the plaintiffs who might claim to have been harmed by Ford have the right to bring their own lawsuit seeking damages for any alleged injuries they may have incurred. Therefore, if you decide to award any punitive damages, your award must be limited to redressing the injuries incurred only by the plaintiffs in this lawsuit." (Italics added.)
In discussions regarding punitive damages instructions, counsel for Ford made the following argument regarding this instruction: "On [Special Jury Instruction] No. 21, particularly State Farm, in a product case, it tells the jury that they are only to focus on these particular plaintiffs. The *324 Romo [v. Ford Motor Co. (2003) 113 Cal. App.4th 738, 6 Cal.Rptr.3d 793 (Romo)] case refers to that same principle as opposed to trying to redress ... claims of other parties. So we would request and argue that that instruction is required by the due process clause and California law as it is developing."
The court denied counsel's request it give that and several other special jury instructions, stating that they "are argumentative, misstate the law or are already covered by the instructions that we will give from CACI." Ford at no time suggested a modification of Special Jury Instruction No. 21 or a separate instruction to clarify that the jury could consider harm to third parties in deciding reprehensibility.
Ford also proposed an instruction, Special Jury Instruction No. 19, based on State Farm, supra, 538 U.S. 408, 123 S.Ct. 1513, that told the jury it could not consider Ford's actions and impact outside the State of California, but also stated that the jury could consider the impact of Ford's conduct on individuals other than the plaintiffs inside the State of California:
"In determining the amount of punitive damages, if any, that is necessary to achieve the proper level of punishment and deterrence, you may consider only Ford's wrongful conduct, if any, that has had an adverse impact on the citizens of California. Accordingly, you may not award any punitive damages for the purpose of punishing Ford for the sale of vehicles in other states for any injuries that may have occurred in other states, or for the purpose of changing Ford's conduct in other states." [12] (Italics added.)
Counsel for plaintiffs requested Special Jury Instruction No. 19 be modified to state "in determining the reprehensibility of Ford's actions, you may consider Ford's conduct in California and elsewhere." As counsel explained to the court, "[W]hen talking about the reprehensibility of Ford's actions which is the chief and primary consideration or guidepost that the jury must consider, I believe that under the case law they are entitled from an evidentiary standpoint to consider acts outside of California so long as they are similar to what we are dealing with in this case. [A]s long as when awarding the amount of punitive damages they focus on the harm to this plaintiff and the act that was done to this plaintiff. When dealing with the issue of reprehensibility though, is this an isolated act or have they done this elsewhere, I think they can consider extraterritorial [conduct]." The court refused the requested modification and gave Special Jury Instruction No. 19 as proposed by Ford.

(2) Plaintiffs proposed Special Jury Instruction No. 1

Plaintiffs proposed Special Jury Instruction No. 1, based on State Farm, supra, 538 U.S. 408, 123 S.Ct. 1513, listed the factors to consider in determining reprehensibility, including "whether the conduct involved repeated actions or an isolated incident." Ford objected to that instruction. While Ford acknowledged the proposed instruction tracked State Farm's discussion of "factors that are relevant to ... reprehensibility," Ford asserted those factors were not "exclusive" and argued that if the instruction were given, the court should add additional factors: "First, whether the defendant's conduct was consistent with industry standards *325 and customs. Second, whether defendant's conduct conformed to government safety standards. And third, whether the defendant had a reasonable ground for believing its conduct was lawful." Ford also argued the repeated conduct factor was inapplicable to a product liability case involving the sale of vehicles because "it's inappropriate and misleading to suggest to the jury the fact that ... the company was engaging in its lawful business, selling multiple automobiles, could somehow be an evil that was punishable."
The court rejected plaintiffs Special Jury Instruction No. 1. With regard to the reprehensibility factor and whether the conduct was an isolated or repeated act, the court stated: "... I think that flies in the face of what the court will be instructing on with regard to No. 19, saying not to consider ... injuries that have occurred in other states." The court also stated, "The jury understands the word `reprehensible.' [B]oth sides are going to be able to argue this case and you can say why it is or is not reprehensible."

(3) Punitive damages instructions given by court

The court instructed the jury as follows on punitive damages: "The purposes of punitive damages are to punish a wrongdoer and to discourage it and others from similar conduct in the future. There is no fixed standard for determining the amount of punitive damages and you are not required to award any punitive damages. In deciding the amount of punitive damages, if any, you should consider all of the following separately for ... the defendant. A, how reprehensible was the defendant's conduct; B, is there a reasonable relationship between the amount of punitive damages and [the plaintiffs'] harm; C, in view of the defendant's financial condition, what amount is necessary to punish it and discourage future wrongful conduct. [¶] You should keep in mind that compensatory damages, although awarded to compensate plaintiffs for their injuries, also may ... have the effect of punishing and deterring misconduct. Therefore, in determining whether and in what amount to award any punitive damages, you should consider the deterrence and punishment imposed solely by any [punitive] damages you may award and when added to the sum you have already imposed as compensatory damages. [¶] In determining the amount of punitive damages, if any, that is necessary to achieve the proper level of punishment and deterrence, you may consider only Ford's wrongful conduct, if any, that has had an adverse impact on the citizens of California. Accordingly, you may not award any punitive damages for the purpose of punishing Ford for the sale of vehicles in other states for any injuries that may have occurred in other states, or for the purpose of changing Ford's conduct in other states. [¶] `Punitive damages must bear a reasonable relationship to compensatory damages."

(4) Closing argument

As will be discussed in more detail, post, in closing argument when discussing the reprehensibility of Ford's conduct, plaintiffs' counsel made reference to the impact of Ford's actions on third parties within California, stating such things as "thousands of these vehicles were manufactured and sold in their defective condition and they are on our highways in California," and "they marketed to specifically, the soccer moms, the women with babies, the toddler seats, the families."
At no time during closing arguments did Ford object to the statements made by plaintiffs' counsel. Further, in its own closing arguments counsel for Ford did not caution the jury to focus only on the injuries *326 to plaintiffs or on Ford's impact in California. Indeed, in responding to plaintiffs' closing argument, Ford's counsel emphasized plaintiffs' counsel's reference to targeting "soccer moms," stating, "Mr. Schoville said to you that they targeted the soccer moms. That they ... let this vehicle out to the people out in California, knowing that it was dangerous and defective." Ford attempted to rebut this argument by noting the testimony of Ford's management that they and their families drove Explorers and commented, "[D]o you really believe that they are going to put their own families at risk if they knowingly put out a defective vehicle." Ford's argument focused on apologizing for its actions and asking the jury not to punish Ford for the fact it was a large corporation or because the lawyers "did a lousy job defending the company." Counsel for Ford commented about the "David versus Goliath" nature of the case, stating, "You saw the full wrath, if you will, Ford's power demonstrated for you in the number of lawyers and the amount of money they paid their experts." Nevertheless, counsel argued the verdict was the product of Ford being "out-lawyered. With all our money and all our power, we were out-lawyered."
Counsel for Ford also attempted to present evidence that was excluded at trial concerning (1) the number of times they had successfully defended this type of case, (2) the overall safety record of the Explorer, and (3) comparing the risk of the Explorer to other vehicles. Plaintiffs' counsel objected to this attempted argument, and the court sustained the objections.
After the court instructed the jury and the jury began deliberations, counsel for Ford belatedly objected to plaintiffs' closing argument and requested a mistrial, arguing it was improper for plaintiffs' counsel to argue "this was a case not about these plaintiffs but about soccer moms and other families." The court denied the motion. The court also interpreted the motion as one to strike the belatedly objected-to portions of plaintiffs' counsel's argument, noting it was not practical to send a note to the jury saying that portions of the argument had been stricken.

b. Analysis

(1) The court properly rejected Ford's Special Jury Instruction No. 21

As discussed, ante, Philip Morris holds that "upon request" trial courts must "provide assurance that juries are not asking the wrong question* i.e., seeking, not simply to determine reprehensibility, but also to punish for harm caused to strangers." (Philip Morris, supra, ___ U.S. at pp. ___, ____. 127 S.Ct. at pp. 1065, 1064, 166 L.Ed.2d at pp. 951, 950, italics added.)
At the bifurcated punitive damages portion of the trial, Ford argued Romo and State Farm required the court to instruct the jury that, in determining the appropriate amount of punitive damages, if any, it could not punish Ford for harm caused to third parties. However, Ford's Special Jury Instruction No. 21 was an incorrect and incomplete statement of the law and contradicted the holdings of Philip Morris and State Farm. Ford's proposed Special Jury Instruction No. 21, did not merely tell the jury it could not impose punishment for harm suffered by third parties. Rather, it told the jury it could not consider third party harm for any purpose, including in assessing the reprehensibility of Ford's conduct. As proposed, Ford's instruction directly contradicted the holding of Philip Morris that a plaintiff may show "harm to other victims" in order to demonstrate a defendant's conduct "was particularly reprehensible." *327 (Philip Morris, supra, ___ U.S. at p. ____, 127 S.Ct. at pp. 1063-1064, 166 L.Ed.2d at p. 949.) In fact, this rule was well established at the time Ford proposed its instruction and had recently been confirmed in State Farm, supra, 538 U.S. at pages 419, 423, 123 S.Ct. 1513, upon which Ford relied in urging the court to give its Special Jury Instruction No. 21.
Ford's Special Jury Instruction No. 21 contradicted another instruction the court gave to the jury, namely, "in deciding the amount of punitive damages," the jury must consider "how reprehensible was the defendant's conduct." Under State Farm, two factors the jury was charged with determining in assessing the reprehensibility of Ford's conduct were whether the conduct demonstrated an indifference or reckless disregard for the safety of others and whether the conduct was repeated or an isolated incident. (State Farm, supra, 538 U.S. at p. 419, 123 S.Ct. 1513.) Thus, Ford's proposed Special Jury Instruction No. 21 not only directly contradicted the holdings in State Farm and Philip Morris, but it also contradicted another instruction given by the court.
An appropriate jury instruction would have been one similar to BAJI No. 14.72.2, which was amended to comport with Philip Morris, and which delineates the purposes for which a jury may consider third party harm and for what purpose a jury could not: "... If you find that defendant had a practice of engaging in, and profiting from wrongful conduct [occurring in California] similar to that which injured the plaintiff, that evidence may be considered in deciding the issues of reprehensibility, whether punitive damages should be assessed, and if so, the amount of punitive damages to be awarded. Do not include in your award of damages any sum that represents damages for injuries to any person other than the plaintiff[s]." (BAJI No. 14.72.2 (Fall 2007-2008 ed.), italics added.)
California law provides that incorrect or misleading jury instructions may be rejected by the courts: "`A trial court has no duty to modify or edit an instruction offered by either side in a civil case. If the instruction is incomplete or erroneous the trial judge may ... properly refuse it.'" (Boeken v. Philip Morris, Inc. (2005) 127 Cal.App.4th 1640, 1673, 26 Cal. Rptr.3d 638 (Boeken), quoting Truman v. Thomas (1980) 27 Cal.3d 285, 301, 165 Cal.Rptr. 308, 611 P.2d 902.) Thus, by proposing an instruction that was an incorrect and misleading statement of law, Ford has forfeited the right to assert instructional error before this court.[13]
Further, the fact Ford relies on Philip Morris to assert its due process rights were violated does not change this result: "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. Courts may for that reason refuse to consider a constitutional objection even though a like objection had previously been sustained in a case in which it was properly taken. While this court in its discretion sometimes departs from this *328 rule in cases from lower federal courts, it invariably adheres to it in cases from state courts...." (Yakus v. United States (1944) 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834, citations omitted.) Indeed, the Supreme Court has held that it is precluded from reaching a due process challenge because of a party's failure to submit relevant jury instructions: "We have no difficulty agreeing with the State that [defendant's] counsel's failure to urge that the court instruct the jury on scienter constitutes an independent and adequate statelaw ground preventing us from reaching [defendant's] due process contention on that point." (Osborne v. Ohio (1990) 495 U.S. 103, 123, 110 S.Ct. 1691, 109 L.Ed.2d 98.)
In both criminal and civil cases, the United States Supreme Court will not review a federal claim arising out of state court litigation unless there is "no doubt from the record" the claim "was presented in the state courts and that those courts were apprised of the nature or substance of the federal claim at the time and in the manner required by the state law." (Webb v. Webb (1981) 451 U.S. 493, 501, 101 S.Ct. 1889, 68 L.Ed.2d 392.) Similarly, California courts have declined to review claims of federal constitutional error in the absence of a specific and timely objection made in the trial court. (See People v. Monterroso (2004) 34 Cal.4th 743, 759, 22 Cal.Rptr.3d 1, 101 P.3d 956, cert. den. (2005) 546 U.S. 834, 126 S.Ct. 61, 163 L.Ed.2d 89; People v. Burgener (2003) 29 Cal.4th 833, 869, 129 Cal.Rptr.2d 747, 62 P.3d 1, cert. den. (2003) 540 U.S. 855, 124 S.Ct. 146,157 L.Ed.2d 100.)
Thus, by proposing a jury instruction that incorrectly and incompletely stated the law, and contradicted existing precedent and other jury instructions given by the court, Ford forfeited its due process challenge to the punitive damages award.
It is true, as Ford asserts, that trial courts have an obligation to instruct juries on the "controlling legal principles" in a case, even in the absence of a specific request from one of the parties. (Agarwal v. Johnson (1979) 25 Cal.3d 932, 951, 160 Cal.Rptr. 141, 603 P.2d 58.) However, this rule only comes into play when there is "a complete failure to instruct on material issues and controlling legal principles." (Ibid.) "`[I]f its charge does not fully cover the facts and issues as counsel conceive them, it is [counsel's] duty to request instructions upon specific questions arising.'" (Thomas v. Buttress & McClellan, Inc. (1956) 141 Cal.App.2d 812, 820, 297 P.2d 768.) Here,"the court did instruct the jury on the controlling legal principles concerning punitive damages. If Ford wanted a limiting instruction concerning third party harm, it was Ford's duty to supply an accurate and complete instruction, which it did not do here.
Nor can Ford complain that it could not anticipate Philip Morris would reiterate the rule that juries could consider third party harm in determining reprehensibility. At the time of the punitive damages phase of the trial in June of 2004, both state and federal case law uniformly held a defendant's similar wrongful conduct toward others was a proper consideration in evaluating the reprehensibility of the defendant's conduct toward the plaintiff, and therefore was a proper consideration in determining the amount of punitive damages to award: "State Farm, in turn, did not bar deterrence of future public injuries as a goal of punitive damages. The court reiterated its statement in BMW [of North America, Inc. v. Gore (1996) 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (BMW),] that `"[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"' *329 (State Farm, supra, 538 U.S. at p. 416[, 123 S.Ct. 1513)] and did not limit the concept to punishment and deterrence purely on behalf of the plaintiff. In elaborating on BMW's reprehensibility guidepost, the court in State Farm noted that conduct involving `repeated actions' was worse than, and could be punished more severely than, conduct limited to `an isolated incident.' (State Farm, supra, at p. 419[, 123 S.Ct. 1513].)" (Johnson, supra, 35 Cal.4th at p. 1206, 29 Cal.Rptr.3d 401, 113 P.3d 82, italics added.) "To consider the defendant's entire course of conduct in setting or reviewing a punitive damages award ... is not to punish the defendant for its conduct toward others." (Id. at p. 1206, fn. 6, 29 Cal.Rptr.3d 401, 113 P.3d 82.)
Indeed, in arguing for Special Jury Instruction No. 21, counsel for Ford cited Romo, supra, 113 Cal.App.4th 738, 6 Cal. Rptr.3d 793, disapproved on other grounds in Johnson, supra, 35 Cal.4th at pages 1205-1207, 1213, 29 Cal.Rptr.3d 401, 113 P.3d 82, for the proposition that the jury could not punish it for harm to third parties. In Romo, the Fifth District Court of Appeal, anticipating Philip Morris, concluded that in State Farm the Supreme Court had already held that it was improper to punish defendants for harm to third parties: "As we read State Farm, then, the legitimate state goal that punitive damages may seek to achieve is the `condemnation of such conduct' as has resulted in 'outrage and humiliation' to the plaintiffs [citation]; it is not a permissible goal to punish a defendant for everything else it may have done wrong." (Romo, supra, at pp. 749-750, 6 Cal.Rptr.3d 793.) Elsewhere, the Romo court stated that juries may only punish defendants "based solely on the harm to the plaintiffs." (Id. at p. 753, 6 Cal.Rptr.3d 793.) However, the Romo court also correctly predicted Philip Morris's's reiteration that third party harm could still be considered on the issue of reprehensibility: "[T]his focus upon punishing the defendant solely for the outrage inflicted upon the present plaintiffs is not an evidentiary limitation. Plaintiffs are still entitled to show similar conduct on the issue of reprehensibility." (Romo, supra, at p. 753, fn. 7, 6 Cal.Rptr.3d 793.)
Based on its knowledge of existing precedent, Ford could have crafted a jury instruction (or instructions) that properly and completely informed the jury for what purposes it could consider third party harm and for what purposes it could not. Nevertheless, Ford elected to submit to the court an instruction contrary to this well-established precedentprecedent it relied upon in arguing the court should give Special Jury Instruction No. 21. Instead, Ford argued against plaintiffs Special Jury Instruction No. 1, which instructed the jury it could consider Ford's repeated conduct in assessing reprehensibility. Ford even went so far as to argue that if the court gave an instruction on the factors delineated in State Farm and in California authority (see, e.g., Simon, supra, 35 Cal.4th at p. 1180, 29 Cal.Rptr.3d 379, 113 P.3d 63) in determining the reprehensibility of a defendant's conduct, the court should add additional factors not approved by any precedent and rejected by this court in Buell-Wilson I as being inappropriate considerations.
In doing so, Ford forfeited the right to contend on appeal the court erred in failing to instruct the jury under its Special Jury Instruction No. 21. (Boeken, supra, 127 Cal.App.4th 1640, 26 Cal.Rptr.3d 638.) In Boeken, the Second District Court of Appeal rejected defendant Philip Morris's contention, raised for the first time on appeal, that the jury should have been given an instruction based on State Farm, because Supreme Court precedent already established that defendants could not be *330 punished for extraterritorial conduct: "... Philip Morris argues that the trial court should have instructed the jury using language similar to that from State Farm 'that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred.' Philip Morris forfeited this issue by failing to request such an instruction from the trial court. State Farm was not the first case enunciating this concept. It was first addressed in BMW, where the Court stated that `a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.' [Citation.] Thus, BMW provided sufficient authority to enable Philip Morris to draft and request an appropriate instruction. The trial court was not required to draft it for Philip Morris." (Boeken, supra, at p. 1694, fn. 27, 26 Cal. Rptr.3d 638.)
Indeed, in a recent Ninth Circuit case, White v. Ford Motor Co. (9th Cir.2007) 500 F.3d 963 (White), it was noted that trial counsel for Ford in 2004 (before the trial in the instant matter) requested the court instruct the jury on third party harm, but at the same time acknowledged third party harm could be considered in considering reprehensibility: "Concerned that the jury would punish Ford for the harm suffered by other ... victims, ... Ford ... requested an instruction that would prevent the jury from punishing `[Ford] in this case not just for the harm to these plaintiffs, but for harm to other plaintiffs, whether in state or out of state.' Ford conceded that evidence of harm to other people could be considered by the jury in assessing reprehensibility, but argued that the jury could punish only `for the harm to this plaintiff.' The district court refused such an instruction, deciding that it was not required by existing precedent." (Id. at p. 972, italics added.)
Here, counsel for Ford was aware during the 2004 trial that United States Supreme Court and California precedent provided that, in determining the reprehensibility of a defendant's conduct, juries could consider (1) whether the defendant's conduct demonstrated an indifference or reckless disregard for the health or safety of others; and (2) whether a defendant's actions were repeated or an isolated act that only impacted the plaintiff, both factors relating to third party harm. (State Farm, supra, 538 U.S. at p. 419, 123 S.Ct. 1513; Simon, supra, 35 Cal.4th at p. 1180, 29 Cal.Rptr.3d 379, 113 P.3d 63.) As discussed, ante, Ford argued against giving such an instruction to the jury and instead proposed a jury instruction that would have forbidden the jury from considering these factors.
The Philip Morris decision holds "the States have some flexibility to determine what kind of procedures they will implement" to instruct the jury with regard to punitive damages. (Philip Morris, supra, ____ U.S. at p. ____, 127 S.Ct. at p. 1065, 166 L.Ed.2d at p. 951.) Further, the Supreme Court held a jury instruction on third party harm need only be given where the risk of prejudice to the defendant is "significant" and only "upon request." (Ibid.) Thus, Philip Morris (and other controlling United States Supreme Court precedent) comports with California law providing that proper instructions must be presented by counsel, and misleading or inaccurate instructions may be rejected.

(2) Ford's Special Jury Instruction No. 19

Further compounding the matter, Ford submitted, and the court accepted, Special Jury Instruction No. 19, based on State Farm's holding that limited the jury's consideration of defendant's conduct *331 to that which occurred in the state where the action is pending. However, that jury instruction also told the jury they could consider the impact of Ford's actions on California citizens other than the plaintiffs, i.e., that the jury could consider harm to third parties, as long as it was limited to California: "In determining the amount of punitive damages, if any, that is necessary to achieve the proper level of punishment and deterrence, you may consider only Ford's conduct, if any, that has had an adverse impact on the citizens of California." (Italics added.) Further, as we discuss, post, the argument of counsel regarding harm to third parties in closing argument on the punitive damages phase was limited to harm to persons within California. It was thus within the parameters of Ford's own instruction. Thus, to the extent the jury was allowed to consider third party harm in the punitive damages phase of the trial, Ford invited the error. (Stevens v. Owens-Corning Fiberglas Corp. (1996) 49 Cal.App.4th 1645, 1653-1655, 57 Cal.Rptr.2d 525 [appellants cannot complain on appeal about jury instructions they requested].)

(3) Ford's belated objection to plaintiffs' oral argument

The fact Ford belatedly objected to plaintiffs' counsel's oral argument also does not aid Ford's position. First, as discussed in detail, ante, the third party harm instruction Ford proposed was an incorrect statement of law that conflicted with State Farm and Philip Morris.
Second, plaintiffs' arguments were within Special Jury Instruction No. 19, submitted by Ford, that stated the jury could consider the impact of Ford's conduct on persons other than the plaintiffs inside California. In plaintiffs' counsel's closing arguments at the punitive damages phase, he made it clear he was "focusing in this argument just on this state."
Third, Ford's objection came too late, after the jury had begun deliberations. (Horn v. Atchison, T & S.F. Ry. Co. (1964) 61 Cal.2d 602, 610, 39 Cal.Rptr. 721, 394 P.2d 561 [objections forfeited because "[a]t no time did counsel for defendant ... interrupt plaintiffs counsel's opening or closing arguments to make objections as to the claimed instances of misconduct. Instead he elected to sit by while the improprieties accumulated until the conclusion of the closing argument, and then move for a mistrial"]; Grimshaw, supra, 119 Cal. App.3d at pp. 797-798, 174 Cal.Rptr. 348 [Ford waived challenge to alleged misconduct of counsel; motion for mistrial too late to raise issue]; Warner Constr. Corp. v. City of Los Angeles (1970) 2 Cal.3d 285, 302-303, 85 Cal.Rptr. 444, 466 P.2d 996 [failure to assert contemporaneous objection to improper argument of counsel concerning defendant's "wealth" waived right to seek mistrial].)

(4) Ford's failure to request limiting instruction at trial

As will be discussed in detail, post, Ford asserts it was error and a violation of due process for the court to admit evidence concerning the Bronco IPs and the Explorer's propensity to roll over, as that evidence, and argument relating to it, allowed the jury to punish Ford for harm to third parties. Ford asserts it properly preserved this issue by filing a motion in limine to exclude evidence or argument of third party harm. However, that motion in limine sought in part to exclude evidence of (1) Ford's actions outside California; and (2) evidence of Ford's financial condition or net worth.
Further, although Ford's motion in limine made passing reference to the fact that "plaintiffs should not be permitted *332 to urge the jury to vindicate the rights of other persons not before the court" or to "punish Ford for any conduct that goes beyond the specific harm alleged to the plaintiffs in this case," counsel conceded at oral argument before this court that some of the Bronco II and Explorer evidence was admissible and for certain purposes. As we explained in Buell-Wilson I, and discuss in detail, post, such evidence was admissible for purposes not impacted by Philip Morris. However, Ford never requested the court instruct the jury regarding the purposes for which that evidence could or could not be considered. This failure also resulted in a forfeiture of the right to raise the third party harm issue on appeal: "`When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly.' [Citation.] Thus, although a court should give a limiting instruction on request, it has no sua sponte duty to give one." (People v. Hernandez (2004) 33 Cal.4th 1040, 1051, 16 Cal.Rptr.3d 880, 94 P.3d 1080, second italics added.)

(5) Ford's failure to raise instructional error on appeal

It is undisputed Ford did not appeal to this court on the basis the jury had been incorrectly instructed or there was improper closing argument by counsel. It is further undisputed Ford did not raise instructional error or assert improper argument by counsel in its petition for rehearing or petition for review to the California Supreme Court. Indeed, at oral argument before this court, counsel for Ford acknowledged it never asserted instructional error or improper argument of counsel as a basis for reversing the judgment on the first appeal.
Ford has forfeited the right to raise instructional error here in response to Philip Morris. The United States Supreme Court lacks jurisdiction over federal questions "not pressed or passed upon in the state courts." (Stern, supra, § 3.16, p. 171.) Ford was required not only to raise the issue in the trial court, but to pursue it "on appeal to higher state courts ... in the manner and with the degree of specificity required by the state rules of practice." (Stern, supra, at § 3.18(b), p. 179, citing Beck v. Washington (1962) 369 U.S. 541, 549-554, 82 S.Ct. 955, 8 L.Ed.2d 98.) "`Without any doubt it rests with each State to prescribe the jurisdiction of its appellate courts, the mode and time of invoking that jurisdiction, and the rules of practice to be applied in its exercise; and the state law and practice in this regard are no less applicable when Federal rights are in controversy than when the case turns entirely upon questions of local or general law.'" (Wolfe v. North Carolina (1960) 364 U.S. 177, 195, 80 S.Ct. 1482, 4 L.Ed.2d 1650.)
Indeed, Ford understood at the time of its first appeal that juries could not punish defendants for harm to third parties. In its opening brief in the original appeal Ford argued that "plaintiffs' invocation of the Bronco II as a basis for punitive damages, in and of itself, is unconstitutional and grounds for reversal, because due process forbids imposing punitive damages against a defendant for conduct other than the specific conduct that harmed the plaintiffs before the court." However, Ford was attacking plaintiffs' closing argument during the liability phase of the trial, argument that, as we explain, post, was entirely proper. Moreover, that statement was in a section of Ford's brief asserting that the admission of the Bronco II evidence constituted a grounds for reversal of the judgment, not in Ford's argument that the *333 punitive damages award should be reversed. This passing reference in a separate portion of Ford's brief was insufficient to raise a constitutional question on the punitive damages award. (Bd. of Dirs. of Rotary Int'l v. Rotary Club (1987) 481 U.S. 537, 550, fn. 9, 107 S.Ct. 1940, 95 L.Ed.2d 474 ["casual reference" in appellate brief in unrelated argument "is insufficient to inform a state court that it has been presented with a claim" subject to Supreme Court jurisdiction]; Adams v. Robertson (1997) 520 U.S. 83, 88-89 & fn. 3, 117 S.Ct. 1028, 137 L.Ed.2d 203 [reference to different related argument in appellate brief did not raise federal question presented to Supreme Court].)
Although it understood then that juries could not award punitive damages to punish defendants for harm to third parties, nowhere in the first appeal did Ford assert the jury should have been instructed on third party harm or that plaintiffs' counsel's arguments during the punitive damages phase of the trial was improper. Ford has thus forfeited the right to raise these issues upon remand.

(6) Recent Ninth Circuit cases

Ford asserts a recent Ninth Circuit case, Merrick v. Paul Revere Life Ins. Co. (9th Cir.2007) 500 F.3d 1007 (Merrick), compels the conclusion the court erred by failing to instruct the jury on third party harm "irrespective of the proposed instruction's precise language." This contention is unavailing.
In Merrick, the jury awarded $10 million in punitive damages in an insurance bad faith action. The plaintiffs bad faith and punitive damages claims "turned upon linking [the defendants'] handling of [the plaintiffs] claim to a decade of allegedly improper claims handling practices." (Merrick, supra, 500 F.3d at p. 1015.) In response, the defendants requested the court instruct the jury as follows: "In deciding whether or in what amount to award punitive damages, you may consider only the specific conduct by Defendants that injured Plaintiff. You may not punish Defendants for conduct or practices that did not affect Plaintiff, even if you believe that such conduct or practices were wrongful or deserving of punishment. The law provides other means to punish wrongdoing unrelated to Plaintiff." (Ibid.) The court denied the request and, on appeal, based on the intervening decision in Philip Morris, the defendant argued the district court's refusal violated its due process rights. (Merrick, supra, 500 F.3d at p. 1007.)
In addressing plaintiffs claim the district court properly denied the defendant's proposed instruction, the Ninth Circuit stated plaintiff was "correct that the first sentence of the proposed instruction [was] misleading because it fail[ed] to indicate that the jury may consider harm to others as part of its reprehensibility analysis." (Merrick, supra, 500 F.3d at p. 1016.) However, based on federal law, the Ninth Circuit then held this error by defendants was not fatal to their appeal because the trial court had a duty to correct the erroneous instruction and give the jury a proper one: "[T]he fact that the proposed instruction was misleading does not alone permit the district judge to summarily refuse to give any instruction on the topic.... Where a proposed instruction is supported by law and not adequately covered by other instructions, the court should give a non-misleading instruction that captures the substance of the proposed instruction." (Id. at p. 1017, citation omitted.)
However, as discussed in detail, ante, California law does not require judges to correct erroneous or misleading instructions. (Shahinian v. McCormick (1963) 59 *334 Cal.2d 554, 565-566, 30 Cal.Rptr. 521, 381 P.2d 377, overruled on other grounds in Avila v. Citrus Community College Dist. (2006) 38 Cal.4th 148, 161, 41 Cal.Rptr.3d 299, 131 P.3d 383.) For example, in Boeken, supra, 127 Cal.App.4th at page 1673, 26 Cal.Rptr.3d 638, the Second District Court of Appeal explicitly rejected the exact federal rule announced in Merrick: "[.Instruction 0 was incomplete.... [Defendant] argues that the omission was so minor as to require the trial court to modify the instruction. We disagree. `A trial court has no duty to modify or edit an instruction offered by either side in a civil case. If the instruction is incomplete or erroneous the trial judge may ... properly refuse it.'"
Further, here Ford did not request a legally correct instruction or request the court amend it to properly state the law. Ford also argued against instructing the jury in a proper manner. Indeed, Ford opposed plaintiffs request the court instruct the jury that, in considering reprehensibility, it could consider third party harm, i.e., whether the conduct was repeated. Finally, unlike the defendant in Merrick, Ford did not preserve any issue of instructional error because it failed to raise the issue when it first appealed to this court.
White, supra, 500 F.3d 963, another recent Ninth Circuit case that reversed a punitive damages award because of the court's failure to give a third party harm instruction, also does not support Ford's position. As we noted, ante, in White, counsel for Ford, when requesting an instruction on third party harm, also acknowledged the jury could consider third party harm in assessing reprehensibility: "Concerned that the jury would punish Ford for the harm suffered by other rollaway victims,[[14]] counsel for Ford had objected to the district court's proposed jury instructions, and requested an instruction that would prevent the jury from punishing '[Ford] in this case not just for the harm to these plaintiffs, but for harm to other plaintiffs, whether in state or out of state.' Ford conceded that evidence of harm to other people could be considered by the jury in assessing reprehensibility, but argued that the jury could punish only for the harm to this plaintiff.' The district court refused such an instruction, deciding that it was not required by existing precedent." (White, supra, 500 F.3d at p. 972, italics added.)
In contrast, in this case Ford refused to acknowledge the jury could consider third party harm in addressing reprehensibility, and in fact proposed an instruction that barred the jury from considering this factor and opposed counsel's arguments that the jury should be instructed on third party harm on the issue of reprehensibility. In White, trial counsel for Ford did not submit legally incorrect instructions as it did here, or oppose instructions that could have cured that error.

(7) Revision of CACI instructions after Philip Morris

Ford asserts that because the Judicial Council of California (Judicial Council) recently revised the CACI instructions on punitive damages in response to Philip Morris and declined to add language specifying that juries could consider third party harm in assessing reprehensibility, its instruction was sufficient. We reject this contention.
*335 On May 24, 2007, the Judicial Council's Advisory Committee on Civil Jury Instructions (Advisory Committee) proposed revised CACI instructions in response to Philip Morris. (Advisory Com. Rep. (July 24, 2007) pp. 2-3.)[15] In August 2007 the Judicial Council approved the revisions, which added the following language to CACI Nos. 3940, 3942, 3943, 3945, 3947 and 3949: "Punitive damages may not be used to punish [name of defendant] for the impact of [his/her/its] alleged misconduct on persons other than [name of plaintiff]"
Of importance to our analysis, in considering what revisions should be made to the CACI punitive damages instructions in light of Philip Morris, the Advisory Committee reviewed comments from the public. (Advisory Com. Rep., supra, at pp. 1-2.) The committee noted that "the principal suggestion was to include language that would expressly clarify how harm to nonparties may be considered in determining reprehensibility of the defendant's conduct." (Id. at pp. 2-3.) The committee ultimately rejected that suggestion, stating "because the United States Supreme Court did not approve or suggest any particular language for this purpose, it would be best not to attempt such an addition. The current instructions permit consideration of a defendant's (1) disregard of the health and safety of others and (2) pattern and practice. The committee believes that this language leaves sufficient room for the plaintiff to present harm to others for the limited purpose of proving reprehensibility. " (Id. at p. 3, italics added.)
These comments do not help, and indeed weaken, Ford's position that its proposed instruction on third party harm should have been given. The comments show the Advisory Committee did not deny the need to instruct juries that they may consider third party harm in determining reprehensibility. Rather, they found the existing instructions already did so.[16] One of the CACI instructions the Advisory Committee was speaking of, CACI No. 3945, specifies the factors State Farm and Simon hold juries are to consider in deciding the reprehensibility of a defendant's conduct, including "[w]hether [name of defendant] disregarded the health or safety of others" and "[w]hether [name of defendant]'s conduct involved a pattern or practice."[17]
In this case, Ford did not propose an instruction that set forth the factors juries are to consider in determining reprehensibility. Moreover, as discussed, ante, plaintiff proposed an instruction that would have listed the factors juries were to consider in determining reprehensibility. Ford opposed that instruction, however, and the court refused to instruct the jury *336 with that proposed instruction. Most important, as already discussed in detail, Ford's instruction directly contradicted the amended CACI instructions and Philip Morris because it prohibited the jury from considering third party harm in determining reprehensibility.

(8) Impact of GVR order

Ford asserts the United States Supreme Court's GVR order implies the high court found Ford did not forfeit the right to raise instructional error on appeal. However, GVR orders do not imply any view on the merits of the remanded case and do not necessitate the reversal of the remanded case if the intervening authority is distinguishable or otherwise does not require a change in the original opinion. (In re Patrick W. (1980) 104 Cal.App.3d 615, 618, 163 Cal.Rptr. 848; Stern, supra, § 5.12(b), p. 319, fn. 94 [noting that "in a substantial number of the remanded cases the courts of appeals adhered to the original ruling, and that very few of these judgments were reversed by the Supreme Court"].)
Indeed, despite the GVR order, Buell-Wilson I "retains the ordinary precedential value of a published opinion of an intermediate appellate court and it remains the law of the case on all points other than the federal constitutional issue." (Romo, supra, 113 Cal.App.4th at p. 744, fn. 1, 6 Cal.Rptr.3d 793; accord, Occidental Life Ins. Co. v. State Bd. of Equalization (1982) 135 Cal.App.3d 845, 848, fn. 1, 185 Cal.Rptr. 779 ["we refer to the [vacated] decision ... for the continuing value of its reasoning in nonfederal aspects"]; DeCamp v. First Kensington Corp. (1978) 83 Cal.App.3d 268, 279-280, 147 Cal.Rptr. 869; Tarantino v. Superior Court (1975) 48 Cal.App.3d 465, 470, 122 Cal.Rptr. 61; Guidi v. Superior Court (1973) 10 Cal.3d 1, 13, fn. 11, 109 Cal.Rptr. 684, 513 P.2d 908.) The California Supreme Court routinely cites and relies on cases of its own, even when, as it notes, they have been "vacated on other grounds." (See People v. Griffin (2004) 33 Cal.4th 536, 598, 15 Cal.Rptr.3d 743, 93 P.3d 344; People v. Thomas (1992) 2 Cal.4th 489, 518, 7 Cal.Rptr.2d 199, 828 P.2d 101; People v. Allison (1989) 48 Cal.3d 879, 898-899, 258 Cal.Rptr. 208, 771 P.2d 1294.)
Accordingly, we conclude Ford forfeited the right to assert, under Philip Morris, that the court erred in failing to instruct the jury that it could not punish Ford for harm to third parties.

(9) Post-oral argument legal developments

After oral argument was heard and this matter was submitted, two cases were filed relevant to our discussion of Ford's forfeiture of the right to raise the issue of whether the court erred in failing to instruct the jury on third party harm.
In Bullock v. Philip Morris USA Inc. (2008) 159 Cal.App.4th 655, 71 Cal.Rptr.3d 775 (Bullock), the Second District Court of Appeal concluded that under Philip Morris, supra, ___ U.S. ___, 127 S.Ct. 1057, 166 L.Ed.2d 940, the trial court erred in refusing to instruct the jury, "`You are not to impose punishment for harms suffered by persons other than the plaintiff before you.'" (Bullock, supra, at p. 693, 71 Cal.Rptr.3d 775.) In doing so, the court concluded Philip Morris's proposed instruction was not incomplete or misleading even though it did not include the qualification that evidence of harm to others could be considered to determine the reprehensibility of the conduct that harmed the plaintiff. The Court of Appeal reached this conclusion by first noting that consideration of harm to others to determine the reprehensibility of a defendant's conduct to a plaintiff for the purpose of *337 determining the amount of punitive damages "is not imposing punishment for harm caused to others." (Id. at p. 694, 71 Cal. Rptr.3d 775.) The Court of Appeal further concluded that defendant Philip Morris "had no duty to qualify its proposed instruction in order to encompass a rule of law favorable to Bullock concerning the permissible use of evidence of harm caused to others," in the absence of a request from the plaintiff of such limiting language. (Ibid.) The court also held that a remittitur was not appropriate under the circumstances and ordered a new trial on punitive damages. (Id. at pp. 694, 695 & fn. 21, 71 Cal.Rptr.3d 775).
Bullock, supra, 159 Cal.App.4th 655, 71 Cal.Rptr.3d 775, is distinguishable from our case because, here, Ford's proposed Special Jury Instruction No. 21 did not merely state that the jury could not punish Ford for harm suffered by third parties. Rather, as discussed, ante, that instruction prohibited the jury from considering third party harm for any purpose in setting the amount of punitive damages. Moreover, in our case we do not have a situation where Ford proposed an instruction that correctly stated the law, and the plaintiffs failed to request a qualification that would have made the instruction more favorable to their position. As discussed in more detail, ante, plaintiffs did request that the court instruct the jury for what purposes it was permissible for it to consider third party harm, and the court, at Ford's urging, rejected that instruction. Finally, we have also concluded here that Ford has forfeited the right to raise the contention that the court committed instructional error because it failed to raise this issue on its original appeal.
The second recent case relevant to our discussion is Williams v. Philip Morris, Inc. (2008) 344 Or. 45, 176 P.3d 1255 (Williams II), wherein the Oregon Supreme Court, on remand from the United States Supreme Court's decision in Philip Morris, held that the trial court did not err in refusing to give an instruction that properly told the jury that it could not punish the defendant for harm to third parties, but could consider third party harm in considering the defendant's reprehensibility. (Philip Morris, supra, ___ U.S. at p. ___, 127 S.Ct. at p. 1061, 166 L.Ed.2d at p. 947.) The Oregon Supreme Court reached this conclusion because the instruction misstated Oregon law in two respects unrelated to third party harm. The Williams II court held that a jury instruction need not be given unless it is "`clear and correct in all respects, both in form and in substance, and ... altogether free from error.'" (Willia
ms II, supra, 176 P.3d at p. 56.) "It is not enough ... to offer a proposed instruction that is correct in part and erroneous in part, leaving the trial court to solve the problem for itself." (Id. at p. 56.)
The Williams II decision provides further support for our conclusion here that Ford forfeited the right to assert the court erred in refusing to give Special Jury Instruction No. 21. We have concluded, ante, as the Oregon Supreme Court did, that because Ford's instruction was incomplete, misleading, and affirmatively misstated the law on punitive damages, the court did not have an obligation to give the instruction as written, nor to correct it for Ford.

4. Prejudice

We also conclude, based on our previous reduction of the punitive damages award and the evidence and argument of counsel during the punitive damages phase of the trial, that there was no "significant risk" the jury punished Ford for harm to third parties. Therefore, even assuming the court erred in failing properly to instruct *338 the jury on third party harm, Philip Morris does not necessitate a reversal of the punitive damages award.

a. Standard of review

Under article 6, section 13 of the California Constitution, "[a] judgment may not be reversed for instructional error in a civil case `unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" (Soule, supra, 8 Cal.4th at p. 580, 34 Cal.Rptr.2d 607, 882 P.2d 298.) Instructional error is deemed harmless unless it is "reasonably probable defendant would have obtained a more favorable result" if the error had been corrected. (Id. at p. 570, 34 Cal.Rptr.2d 607, 882 P.2d 298.)

b. Prior reduction of punitive award

As we have explained, ante, in reviewing the amount of a punitive damages award for prejudice, for purposes of our review the relevant amount is not the amount initially awarded by the jury, but rather the amount by which the trial court, and this court, ordered the judgment reduced. (See Hasson, supra, 32 Cal.3d at p. 419, 185 Cal.Rptr. 654, 650 P.2d 1171.)
In deciding whether an award of punitive damages is constitutionally excessive, we-review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. "This `[e]xacting appellate review' is intended to ensure punitive damages are the product of the `"`application of law, rather than a decisionmaker's caprice.'"'" (Simon, supra, 35 Cal.4th at p. 1172, 29 Cal.Rptr.3d 379,113 P.3d 63.)
Moreover, there is a distinction to be drawn between what is traditionally referred to as a "remittitur," which we applied to the emotional distress damages, and a reduction of an excessive punitive damages award: "A constitutionally reduced verdict ... is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is unreasonable on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court ..., a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." (Johansen v. Combustion Engineering, Inc. (11th Cir.1999) 170 F.3d 1320, 1331-1332, fn. & citation omitted.)
"Thus, in deciding the constitutional maximum [for a punitive damage award], a court does not decide whether the verdict is unreasonable based on the facts; rather, it examines the punitive damages award to determine whether it is constitutionally excessive and, if so, may adjust it to the maximum amount permitted by the Constitution." (Gober, supra, 137 Cal.App.4th at p. 214, 40 Cal.Rptr.3d 92.) This is so because "`the level of punitive damages is not really a "fact" "tried" by the jury.'" (Cooper Industries, Inc. v. Leatherman Tool Group, Inc. (2001) 532 U.S. 424, 437, 121 S.Ct. 1678, 149 L.Ed.2d 674.) Thus, "the jury's award of punitive damages does not constitute a finding of `fact'" to which an appellate court must defer. (Ibid.)
As we discussed in Buell-Wilson I and reiterate in this opinion, we remitted the noneconomic damages to an amount *339 supported by the evidence and omitted any punitive element.
Moreover, in deciding the constitutionally permissible amount of punitive damages in our original opinion, we conducted a de novo review of the punitive damages award, applying the factors dictated by State Farm and other applicable precedent. Our Buell-Wilson I opinion, however, did not consider or justify the amount to which we reduced the punitive damages award by reference to potential harm to others. The only evidence we cited in our discussion of punitive damages related to harm to third parties was in our discussion of the reprehensibility of Ford's conduct. (Buell-Wilson I, supra, 141 Cal.App.4th at pp. 568-569, 46 Cal.Rptr.3d 147.) Thus, in conducting our independent review and arriving at a constitutionally permissible amount of punitive damages, we satisfied the due process concerns of Ford.
For example, in Romo, supra, 113 Cal. App.4th 738, 6 Cal.Rptr.3d 793, disapproved on other grounds in Johnson, supra, 35 Cal.4th at pages 1205-1207, 1213, 29 Cal.Rptr.3d 401, 113 P.3d 82, the Court of Appeal was reconsidering a punitive damages award in light of State Farm after the United States Supreme Court vacated the Court of Appeal's original decision. (Romo, supra, at p. 743, 6 Cal.Rptr.3d 793.) The Court of Appeal concluded the jury instructions given by the trial court violated State Farm and prejudiced Ford. (Romo, supra, at pp. 753-754, 6 Cal.Rptr.3d 793.) However, rather than remanding the matter for a new trial on punitive damages, the Court of Appeal reduced the award to an amount that was not constitutionally excessive: "While the underlying facts supporting a punitive damages award are for the jury to decide, the amount of punitive damages must be independently reviewed on appeal. [Citation.] In conducting such review, we remove any prejudice accruing to the defendant as a result of misinstruction concerning the amount of such award; we do so by modifying the judgment to reflect a level of punitive damages below which we believe no properly instructed jury was reasonably likely to go. [Citation.] Accordingly, our reduction of the award satisfies the due process interests of defendant." (Id. at p. 754, 6 Cal.Rptr.3d 793.)
In determining as a matter of law the constitutionally appropriate amount of punitive damages when this matter was first before us, we also necessarily reduced the award to comport both with due process principles, including the notion Ford could not be punished for harm to third parties, and the factors to be considered under State Farm. We made an independent determination under these factors that Ford's conduct justified an award of punitive damages in an amount equal to a two-to-one ratio to the compensatory damages, which we had already reduced to eliminate any potential punitive effect. We did not consider harm to third parties (except when assessing the reprehensibility of Ford's conduct) when making that award.
There is no basis for a further reduction in the award or a new trial on punitive damages, as the reduced amount of the award comports with the holding of Philip Morris. c. Evidence and arguments at trial

Ford has also failed to demonstrate that evidence or argument at trial prejudiced it in a manner that would require, under Philip Morris, a further reduction in the punitive damages award or a new trial on punitive damages.

(1) Evidence admitted at trial

Ford first asserts that admission of evidence at the liability and compensatory *340 damages phase of the trial regarding the Bronco II's and Explorer's propensity to roll over was itself a due process violation under Philip Morris. However, as we explained in our original decision, and again in this opinion, ante, that evidence was properly admitted as relevant to issues related to proof the product was defective in the plaintiffs' case-in-chief. The Bronco II and Explorer evidence was relevant during the liability phase of the trial to show, under California law, that Ford had notice of the defective product. (Hasson, supra, 32 Cal.3d at p. 404, 185 Cal. `Rptr. 654, 650 P.2d 1171.) Further, as stated, ante, that evidence was admissible to show Ford acted with malice on the issue of whether the plaintiffs were entitled to an award of punitive damages. "Marketing a product that is known to be defective and dangerous to consumers supports an inference of malice for purposes of punitive damages." (Karlsson, supra, 140 Cal.App.4th at p. 1230, 45 Cal.Rptr.3d 265; Grimshaw, supra, 119 Cal.App.3d at p. 814, 174 Cal.Rptr. 348; Taylor, supra, 24 Cal.3d at p. 895, 157 Cal.Rptr. 693, 598 P.2d 854 [malice may be shown by fact the defendant had acted with a "conscious disregard of the safety of others"].)
As our Supreme Court explained in Johnson, United States Supreme Court precedent "makes clear that due process does not prohibit state courts, in awarding or reviewing punitive damages, from considering the defendant's illegal or wrongful conduct towards others that was similar to the tortious conduct that injured the plaintiff or plaintiffs. [A] civil defendant's recidivism remains pertinent to an assessment of culpability." (Johnson, supra, 35 Cal.4th at p. 1204, 29 Cal.Rptr.3d 401, 113 P.3d 82.) "`"[Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"' [citation] and [State Farm ] did not limit the concept to punishment and deterrence purely on behalf of the plaintiff." (Id. at p. 1206, 29 Cal.Rptr.3d 401,113 P.3d 82.)
Nowhere does Philip Morris suggest due process requires trial courts to exclude otherwise relevant, admissible evidence in the process of determining liability or whether an award of punitive damages is warranted. "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." (State Farm, supra, 538 U.S. at p. 422,123 S.Ct. 1513.)
Rather, Philip Morris held that in appropriate cases courts will need to ensure, by appropriate jury instructions and limitations on argument by counsel, that evidence of third party harm is not used to punish defendants when determining the amount of punitive damages to award.

(2) Closing arguments at liability phase

Ford also attacks statements made by plaintiffs' counsel in closing arguments that it claims were in violation of Philip Morris. This contention is unavailing.
In the first phase of the bifurcated trial, the jury was deciding liability, compensatory damages, and whether plaintiffs were entitled to punitive damages. Ford points to closing arguments counsel for plaintiffs made there that allegedly invited the jury to punish Ford for harm to third parties. Specifically, Ford points to the following arguments made by plaintiffs' counsel:
"They go ahead and release the Bronco II in 1983 ... knowing it will roll over and kill or catastrophically injure many *341 people, which it has. [¶] Fraud, oppression, malice, these are issues that relate to one question that has [sic] clear and convincing. T[his is t]he last question on the verdict form, [and] it is the most importan[t] [answer] you will give in this case .... [¶] ... This is the report to the Consumers Union. Bronco II. [The following] [quotation [appears] in the document[:] `We are in deep trouble regarding our rollover rates. Our data are not terribly favorable. Our rollover rate is three times higher than the Chevy S-10 Blazer. We think, however, we have clouded their minds.' Ron Campbell testifies that Ford is aware by 1989 that many people are killed or seriously injured in [Bronco II] rollovers. Right in this time period, and they are going out to market with this new launch [ie., the Explorer] with Job 1 with the engineers telling them [that it had] the same problems. Conscious, deliberate, oppressive, fraudulent conduct. [¶] ... [¶] Hundreds of Explorer rollover cases. [Ford expert] Tandy, involved at least in dozens of on-road untripped Explorer rollover cases. And I cross-examined [Ford expert] Germane, from other cases.... Cases that these guys are working on together. Ford management's willingness to accept this risk from the Bronco II through the [1997 model Explorer] is the definition precisely of fraud, malice and oppression." (Italics added.)
Counsel's argument in the first phase of the trial did not ask the jury to punish Ford for harm to third parties. Rather, as discussed, ante, this argument properly referred to facts supporting entitlement to an award of punitive damages, i.e., whether Ford's actions demonstrated malice, fraud and/or oppression. (See Karlsson, supra, 140 Cal.App.4th at p. 1230, 45 Cal. Rptr.3d 265; Grimshaw, supra, 119 Cal. App.3d at p. 814, 174 Cal.Rptr. 348; Taylor, supra, 24 Cal.3d at p. 895, 157 Cal. Rptr. 693, 598 P.2d 854.) Philip Morris does not stand for the proposition that juries cannot consider the repeated nature of a defendant's conduct in determining whether to award punitive damages, and the factors used to reach that conclusion. Rather, it only held that in determining the amount to award, juries could not punish defendants for harm caused to third parties.

(3) Closing arguments at punitive damages stage

The statements made by plaintiffs' counsel in the bifurcated punitive damages closing argument also did not create a "significant risk" the jury would punish Ford for harm to third parties. Ford focuses on the following arguments by counsel:
"So you understand what the consequences and what the risk factor was that they voluntarily, at the highest level of this company, chose to put people in wheelchairs, brain damaged or death, in a defectively designed product, their decision to put this vehicle out to the market in California. And I am focusing in this argument just on our state. And the effects it has on the people driving these vehicles out there on the highway, not knowing what they are in for if they should do a simple avoidance maneuver. That is the ramification in California, without fixing its known stability problems. That was callous, that was willful disregard. Did they do the test? No. The test drivers are out on the roads of California. Willful disregard of the health and safety of [Mrs. Wilson] and those like her. Was this a single isolated incident? No. You have heard of others in California. Just a few we were allowed to present, [¶] History repeated itself. They had had the same problem before. The same issues. Did they learn? Did they care? Did they really care? [¶] [Thousands of these *342 vehicles were manufactured and sold in their defective condition and they are on our highways in California. And every time we look at one of those vehicles, we hope and pray there is no [accident] avoidance maneuver necessary, [¶] ... [¶] [R]eprehensibility of the conduct I submit to you, here in California, the unlawful conduct taking place in this state that should bear the weight of your discussion and consideration. [¶] ... [¶] This is not only ... a case involving one family here in California, but ... they marketed to specifically, the soccer moms, the women with babies, the toddler seats, the families." (Italics added.)
Based on our review of the record, plaintiffs' counsel was not asking the jury to punish Ford for harm done to third parties. Rather, counsel was discussing the repeated nature of Ford's actions in arguing the reprehensibility of Ford's conduct. That argument was entirely proper and did not create a "significant risk" the jury would punish Ford for injuries to third parties: "California has long endorsed the use of punitive damages to deter continuation or imitation of a corporation's course of wrongful conduct, and hence allowed consideration of that conduct's scale and profitability in determining the size of the award that will vindicate the state's legitimate interests." (Johnson, supra, 35 Cal.4th at p. 1207, 29 Cal.Rptr.3d 401, 113 P.3d 82.) "Nothing [State Farm or Philip Morris have] said about due process review requires that California juries and courts ignore evidence of corporate polices and practices and evaluate the defendant's harm to the plaintiff in isolation." (Ibid.)
Moreover, as discussed, ante, counsel's argument was within the parameters of the special jury instruction submitted by Ford based on the holding in State Farm that juries could not punish defendants for conduct outside the state in which the action was pending. That instruction informed the jury it could consider harm to "the citizens of California." Plaintiffs' counsel informed the jury, when discussing the impact of Ford's actions on third parties, that it was limited to considering Ford's conduct with regard to the citizens of California. Thus, plaintiffs argument was within the bounds of an instruction Ford itself drafted and proposed to the court. Ford cannot complain it was prejudiced by argument based on one of its own instructions.

DISPOSITION
The judgment is affirmed in all respects except as to the award of noneconomic damages to Mrs. Wilson and punitive damages to the Wilsons. The award of punitive damages to the Wilsons is reduced to $55 million. The award of noneconomic damages to Mrs. Wilson is reversed and remanded for retrial on the issue of the amount of noneconomic damages, unless Mrs. Wilson shall, within 30 days from the date this opinion is filed, file with the clerk of this court and serve upon Ford Mrs. Wilson's written consent to a reduction of her noneconomic damages award to $18 million, in which event the judgment shall be modified to award Mrs. Wilson noneconomic damages in that amount, which will result in a total reduced award to the Wilsons of $82,606,004 ($4,606,004 in economic damages + $18 million in noneconomic damages + $5 million in loss of consortium + $55 million in punitive damages), and in which event the judgment will be affirmed in its entirety, as modified. (Cal. Rules of Court, rule 8.264(d).) The parties shall bear their own costs on appeal.
WE CONCUR: McCONNELL, P.J., and IRION, J.
NOTES
[1] GVR is the acronym used within the Supreme Court for "an order that grants certiorari, vacates the judgment below, and remands the case to the lower court for reconsideration in light of an intervening Supreme Court ruling...." (Stern et al., Supreme Court Practice (8th ed.2002) § 5.12(b). p. 317 (Stern).)
[2] Ford Motor Company refers to itself and Drew Ford collectively as "Ford," except where necessary to distinguish between the two. Accordingly, we do the same here.
[3] Ford separately appealed the underlying judgment and the court's rulings on posttrial motions. On January 26, 2005, by stipulation of the parties, these two appeals were ordered consolidated.
[4] The Wilsons also appealed the judgment, but have voluntarily dismissed their appeal. Following briefing in this matter, the Wilsons filed a motion to strike allegedly false statements made in Ford's reply brief. We ordered the motion considered concurrently with the appeal. We deny the motion to strike, but note that in resolving this appeal we have not considered any statements that are not supported by the record. The Wilsons filed a motion for judicial notice, requesting that we take judicial notice of the legislative history of the 1987 amendment to Civil Code section 3294, as well as portions of the legislative histories for unenacted Assembly Bill No. 2880, unenacted Assembly Bill No. 2582, and unenacted Senate Bill No. 1429. The Wilsons also filed a motion for judicial notice requesting that we take judicial notice of a letter Ford filed in the United States Court of Appeals for the Ninth Circuit. We grant these requests.
[5] Ford does assert that the court erroneously admitted evidence that supported the jury's finding on liability and erroneously excluded evidence that supported its defense. However, as is discussed, post, those evidentiary rulings were not an abuse of discretion.
[6] "SLA" is short for "short/long arm" suspension, also known as "double wishbone" suspension.
[7] In making this assertion, Ford neglects to discuss the evidence in support of the Wilsons' damages at all, much less in the light most favorable to the judgment. This failure in itself would allow this court to disregard Ford's arguments concerning damages. (Nwosu v. Uba (2004) 122 Cal.App.4th 1229, 1246, 19 Cal.Rptr.3d 416.) Nevertheless, we elect to consider Ford's contention on the merits.
[8] We also note, as discussed, ante, that we do not review whether the jury's original award of $118 million to the Wilsons "shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (Seffert, supra, 56 Cal.2d at p. 507, 15 Cal.Rptr. 161, 364 P.2d 337.) Rather, since the court remitted the award to $70 million as a condition of denying Ford's motion for new trial, we review the noneconomic damage award "`"as if it had been returned in the first instance by the jury in the reduced amount."' (West, supra, 174 Cal.App.3d at p. 877, 220 Cal.Rptr. 437.)
[9] Mrs. Wilson's projected life span at the time of trial was 33 years. However, we use 35 years here because the award of noneconomic damages included an award for approximately two years of past general damages.
[10] Ford asserts that if the noneconomic damages award to. Mrs. Wilson is determined to be the product of passion or prejudice, we are required, as a matter of law, to grant a new trial on all issues. However, case authority demonstrates it is appropriate to issue a remittitur under such circumstances. (See Deevy, supra, 21 Cal.2d at pp. 120-121, 130 P.2d 389; Bellman v. San Francisco H.S. Dist. (1938) 11 Cal.2d 576, 586-589, 81 P.2d 894; Las Palmas Associates v. Las Palmas Center Associates (1991) 235 Cal.App.3d 1220, 1255-1256, 1 Cal.Rptr.2d 301; Burnett v. National Enquirer, Inc. (1983) 144 Cal.App.3d 991, 1011-1012, 193 Cal.Rptr. 206.)
[11] Following oral argument in this matter, the United States Supreme Court issued its decision in Riegel v. Medtronic, Inc. (2008) ___ U.S. ___, 128 S.Ct. 999, ___ L.Ed.2d ____, holding the Food and Drug Administration's premarket approval process of a balloon catheter used in angioplasty established federal "requirements" under the Medical Device Amendments of 1976 (MDA) that preempted state common law claims for negligence, strict liability and implied warranty. That decision has no impact on our holding as the MDA had a preemption clause that affirmatively barred such claims. (Riegel, supra, at pp. 1003-1005.) As explained, ante, section 30103(e) of the Safety Act, by contrast, contains a savings clause that that explicitly allows such common law claims.
[12] Ford also brought a motion in limine before trial seeking to bar "evidence or argument concerning Ford's out-of-state sales, profits or conduct."
[13] Parties often refer to this as a "waiver." However, that term is incorrect. "[T]he terms `waiver' and `forfeiture' long have been used interchangeably. As the United States Supreme Court has explained, however, `[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right."'" (People v. Simon (2001) 25 Cal.4th 1082, 1097, fn. 9, 108 Cal.Rptr.2d 385, 25 P.3d 598, quoting United States v. Olano (1993) 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508.)
[14] The White case involved a defect in parking brakes in F-series Ford trucks that caused the tragic death of the plaintiffs' three-year-old son when their truck rolled over him in the family's driveway. (White, supra, 500 F.3d at pp. 966-967.)
[15] Ford has attached a copy of the Advisory Committee report to a September 14, 2007 letter brief. We may properly take judicial notice of that document, and do so. (Evid. Code, § 452.)
[16] As discussed, ante, BAJI No. 14.72.2 was also recently amended to state that juries should consider third party harm in determining reprehensibility, but they could not punish a defendant for that third party harm.
[17] CACI No. 3945 provides in part: "If you decide to award punitive damages, you should consider all of the following in determining the amount: [ ] (a) How reprehensible was [name of defendant ]'s conduct? In deciding how reprehensible [name of defendant ]'s conduct was, you may consider, among other factors: [ ] 1. Whether the conduct caused physical harm; [ ] 2. Whether [name of defendant] disregarded the health or safety of others; [] 3. Whether [name of plaintiff] was financially weak or vulnerable and [name of defendant ] knew [name of plaintiff] was financially weak or vulnerable and took advantage of [him/her/it]; [ ] 4. Whether [name of defendant ]'s conduct involved a pattern or practice; and [ ] 5. Whether [name of defendant] acted with trickery or deceit."